**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SHANK/BALFOUR BEATTY and BALFOUR BEATTY CONSTRUCTION, INC.,** Plaintiffs, | : | |
| **v.** | : | **C.A. No. 06-43ML** |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 99,** Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF OBJECTION TO PLAINTIFF'S MOTION TO VACATE AND IN SUPPORT OF DEFENDANT'S MOTION TO CONFIRM ARBITRATION AWARD**

# TABLE OF CONTENTS

**Page**

**I. Facts and Travel**............3

**II. Standard of Review**............8

**III. Argument**............9

**A. Shank's Conduct Prevents the Court From Considering Arbitrability De Novo**............9

**B. The Arbitrator Properly Resolved Substantive Arbitrability Issue**............10

**C. The Arbitrator's Decision Must Be Confirmed**............16

***The Grievance Did Not State a Jurisdictional Dispute***............16

***The Arbitrator Correctly Found That Umling was Improperly Performing Bargaining Unit Work***............19

**D. The Arbitrator's Remedy Must Be Enforced**............24

**IV. CONCLUSION**............26

**CERTIFICATION**............27

## I. **Facts and Travel**

This case involves a dispute between the Plaintiff-company, Shank/Balfour Beatty ("Shank" or "company"), and the Union-defendant, International Brotherhood of Electrical Workers, Local 99 ("Local 99" or "Union"), over the propriety of an unlicensed Shank supervisor doing electrical work in violation of the applicable collective bargaining agreement, called the Special Tunnel Agreement ("STA"). The Arbitrator resolved the grievance in favor of the Union, and the company responded with this motion to vacate.

The Combined Sewer Overflow Abatement Program is a massive, twenty-two year project designed to control pollution flowing into Narragansett Bay. Phase I, which was completed in 2005, involved drilling a 16,000 foot tunnel, 26 feet in diameter, 250 feet beneath the streets of Providence with the capacity of retaining 60 million gallons of waste water pending processing at the sewer plant. Tr. II, p. 10, 15. A tunnel boring machine ("TBM") 225 feet long, 30 feet in diameter, and weighing 690 tons drilled through bedrock at the rate of 19 feet an hour to make this tunnel. Tr. II, p. 10, 17. Three unionized trades (electricians, operating engineers and laborers) were employed on the project working three shifts: 6:30 a.m. to 6:30 p.m., 5 p.m. to 1 p.m., and 10:30 p.m. to 6:30 a.m. Tr. II, p. 6-7. Four electricians (two above ground and two in the tunnel) worked the first shift during Phase I, two (both in the tunnel) worked the second shift and none were assigned to the third shift.[1] Tr. II, p. 7.

Maintenance of the electrical components of the TBM was critical to the continuity of the work. The TBM contains a total of twelve electrical panels, eight on the upper level and four on

[1]Although no electrician was assigned to the third shift, at times the electricians from second shift would still be present during the third shift hours, for example, on an overtime basis.

the lower. Tr. II, p. 17. Each panel contains terminal blocks, contractors, motor starters and control circuits with voltage up to 480 volts. Tr. II, p. 13, 18, 20. Each contains an OSHA-required warning prominently displayed in English and Spanish: "480 VOLTS - WARNING, PANEL HAS MULTIPLE VOLTAGE SUPPLY SOURCES, DANGER, ELECTRICAL EQUIPMENT, AUTHORIZED PERSONNEL ONLY." Tr. II, p. 17-18.

In February 2005, master electrician and Local 99 steward Patrick Brady ("Brady") was working on the second shift. Tr. II, p. 29. One day, Brady and his partner, Bob Powers ("Powers") were running a cable across the top of the machine, up on a ladder, in a very confined space. Tr. II, p. 29. Somehow, a breaker on the gas detection system was shut off which turned off the control system and shut off the TBM. Tr. II, p. 29. As Brady explained before the Arbitrator, the control system is made of up a series of panic switches or emergency stops. "If somebody gets hung up on the machine, you can hit one of these buttons and it will shut down the equipment. * * * There is also tied into that a couple of more sophisticated systems, like the gas detection system. That, again, if it picks up an alarm, it will shut it off." Tr. II., p. 29-30. That day, the gas detection breaker was kicked off, and the system shut down. Tr. II, p. 30. One of the mechanics or laborers came down and said the emergency system was down. Brady determined that none of the stop stations were pulled, so that meant they had to track the problem down by going into one of the high-voltage electrical panels. Tr. II, p. 30. Unbeknownst to Brady, while he and Powers were inside a panel, supervisor Donald Umling ("Umling"), a non-electrician, had decided to start randomly throwing breakers to get the machine started. Tr. II, p. 31. When Umling threw the breaker for the gas detection system the whole panel kicked in. Tr. II, p. 31. Brady and Powers could have been electrocuted. Tr. II, p. 32.

Justifiably upset, Brady and Powers spoke with Umling.[2] Tr. II, p. 32. Brady asked Umling why he was throwing breakers. Umling explained that he did the work because "if he had to wait for Brady it would take all night." Tr. II, p. 32. Local 99 Business Agent Al Durand ("Durand") addressed the Umling problem with the company in the form of a grievance. Joint Ex. 3. The company responded rather dismissively. First, the company felt it necessary to inform the Union that its problem with Umling could not be resolved by either of the two procedures available in the STA - - a jurisdictional dispute procedure[3] or the grievance-arbitration procedure. Joint Ex. 5. Specifically, the company stated that:

> "We have investigated your complaint and can find no basis for processing a grievance under Article 11, or for processing a jurisdictional dispute under Article 7. * * * Moreover, the incident you describe does not involve a jurisdictional dispute under Article 7. Neither IUOE Local 57, nor S/BB, contend that any craft except IBEW Local 99 has jurisdiction for performing electrical work." Joint Ex. 5.

On the merits, the company said that "the best solution" would be "to instruct [] Umling to be more careful in his dealings with electricians, working with them to facilitate job progress, not to provoke possible confrontations." Joint Ex. 5. The company did not deny that Umling was involved in manipulating the electrical system, and admitted that Umling was a supervisor. Joint Ex. 5. Local 99's further attempts to have the safety issues addressed were unsuccessful, and accordingly, the Union sought arbitration.

---

[2]This was not the first time that the Union had problems with Umling performing electrical work. For example, as detailed below, in August 2004, after Brady expressed concerns about electrical work being done by non-electricians, Umling approached Brady and explained that he was doing the electrical work and would continue doing it. Tr. II, 23, 27-28.

[3]As will be explained further within, a jurisdictional dispute involves two unions fighting over which has "jurisdiction" to perform the work in dispute. The Union does not contest that in the event there is a jurisdictional dispute, no arbitration is permitted under the STA.

The parties appeared before the Arbitrator on May 6, and June 6, 2005. At the outset of the first hearing, in a total turnaround from his February 2005 response to the grievance, Shank argued that the grievance was not substantively arbitrable because it was a "jurisdictional dispute" which is not arbitrable under the STA. Tr. I, p. 6-7. Shank also argued that the Arbitrator lacked the authority to make the threshold determination of whether the grievance was in fact substantively arbitrable or not. Tr. I, 9 The Union pointed out that there was no jurisdictional dispute, and that in all events the arbitrator had the authority to make the initial determination on arbitrability, unless the employer first sought relief in Court. Tr. I, p. 8, 10. Both parties agreed that the electrical work in dispute was being performed by a Shank supervisor. Tr. II, p. 8, 20, 63-64; Joint Ex. 5.

After some discussion, the arbitrator concluded that there was no jurisdictional dispute. Specifically, the arbitrator noted that:

> "a jurisdictional dispute is one between two unions over a proper allocation of work, this is not it. This is a question of a member of management, a foreman, doing electrical workers work and an objection to that by the electricians. And it seems to me that that presents a question. It's an arbitrable question of whether or not this is prohibited under the contract. So I'm going to rule that the grievance is arbitrable." Tr. I, p. 22.

Accordingly, the hearings proceeded on the merits.[4] In addition to Brady's testimony, Wolfgang Franzblau ("Franzblau"), an operating engineer testified. Tr. II, p. 43. Franzblau testified that during the two years he worked on the tunnel project for Shank, he had the opportunity to work all three shifts. Tr. II, p. 44. While Franzblau was working for Shank, no

---

[4]After the arbitrator found the grievance arbitrable, Mr. Shank, on behalf of the company, stated that he would not appear at any subsequent hearing to argue the merits. To the contrary, Shank did appear at the second hearing and thus, fully participated in the hearing on both the jurisdictional issue and on the merits.

electricians were assigned to the third shift, but at times, electrical problems developed. Tr. II, p. 45. For the most part, Umling would handle these electrical problems. Tr. II, p. 46. Umling had actually asked Franzblau to do electrical work. Tr. II, p. 46. For example, Franzblau explained that when cutters were being replaced sometimes a circuit breaker would pop. Tr. II, p. 46. One would have to go into the panel to flip it back so that the cutter would turn, which sometimes had to be done repeatedly until the cutter turned. Tr. II, p. 47. Umling would do this, and when he asked Franzblau to do it, Franzblau refused because, as he stated, "I don't know what's going on inside there. I know what a circuit breaker is and how it works. I know I'm not going to get electrocuted throwing it but if you look in the stuff inside there, I don't go reaching into that stuff." Tr. II, p. 47. According to Franzblau, the warnings outside the panels told him that it was outside his area of expertise since he was not an electrician. Tr. II, p. 48. Franzblau stated that when an electrical problem arose, the first reaction was not to call an electrician, but for Umling to try to handle the problem himself, and only when he could not do it would he call in an electrician. Tr. II, p. 48.

The circuit breaker example was not the only electrical problem that Umling would address. Tr. II, p. 49. For example, on another occasion Umling tried to extinguish an electrical fire with a hose. Tr. II, p. 49. Besides Michael Shank himself, no witnesses were presented by the company. No other person from any craft testified that the other craft contended that the work in question was actually engineers' or laborers' work. The single argument on the merits by Shank was that the work in question was not electrical work.

Following the hearings, written briefs were submitted. The arbitrator then rendered his written decision in favor of the Union. Joint Ex. 11. Thereafter, the company refused to comply

with the award and filed the instant motion to vacate. The Union objected, and filed its own motion to confirm.

## II. Standard of Review.

"It is well-established that a district court's ability to review an arbitrator's decision is severely limited." Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union, Local 791, AFL-CIO, 268 F. Supp.2d 115, 121 (D.R.I. 2003). "[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." Id. (quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)). "The rationale for insulating arbitration awards from judicial review is based in the federal statutes which regulate labor-management relations. Id. (citing United Paperworkers Int'l v. Misco, Inc., 484 U.S. 29, 37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). "The statutes manifest a preference for settling labor disputes in the private realm without government intervention." Id. (citing United Paperworkers, 484 U.S. at 37) (explaining that the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 173(d) (2000) provides that '[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.'").

"Accordingly, on review, this Court will not disturb the Arbitrator's factual findings, even if it finds disagreement with them." Id. at 121 (citing Misco, 484 U.S. at 37-38). Likewise, the Court will not set aside an arbitral award if it believes the arbitrator misread the CBA. Id. (citing Id.). "Consequently, provided 'the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority' the fact that a court believes the arbitrator committed 'serious error' does not justify overturning his decision." Id. "This Court, therefore,

is bound to enforce the Award and may not review the merits of the contract dispute provided the Award draws it essence from the collective bargaining agreement." Id. at 122 (citing W.R. Grace, 461 U.S. at 764).

## III. Argument.

### A. Shank's Conduct Prevents the Court from Considering Arbitrability De Novo.

Whether or not the issue of arbitrability has been properly preserved for the Court is important. If it has, then the Court conducts a de novo review of the question of substantive arbitrability. If there has been a waiver because Shank appeared and argued both the arbitrability question and the merits, and because the merits of the dispute and the arbitrability question are inexplicably intertwined, then a more deferential standard applies. Here, Local 99 submits that in order to preserve the issue for judicial review, de novo, the Plaintiff must not only raise a timely objection, but cannot proceed to participate and argue the all issues to the arbitrator. In essence, the company, by its conduct, irregardless of its words, agreed to the Arbitrator's jurisdiction and the Court may now only employ the more deferential standard of review. See, e.g., Freight Drivers, Helpers, Dockmen & Allied Workers Local 375 v. Kingsway Transports, Inc., 1992 WL 281379, at *1-2 (W.D.N.Y. 1992). At the hearings, Shank argued in favor of the arbitrator accepting his interpretation of the jurisdictional dispute and the arbitrability question. By asking the arbitrator to adopt his position, he actually submitted to the arbitrator's jurisdiction, and has thus, waived his argument that the arbitrator lacked the authority to make the call. See id. at *3. Not only that, the company then appeared at the subsequent hearing and presented witness testimony and exhibits in support of its position. It would be patently unfair to afford a de novo review under these circumstances, and thus, the Arbitrator

should be afforded the same degree of deference normally afforded arbitral awards and proceedings.

**B. The Arbitrator Properly Resolved the Substantive Arbitrability Issue.**

The company argues that the Arbitrator lacked authority to decide whether the dispute is substantively arbitrable.[5] "Substantive arbitrability refers to whether a dispute involves a subject matter that the parties have contractually agreed to submit to arbitration."[6] Local 285, Service Employees Int'l Union, AFL-CIO v. Nonotuck Resource Associates, Inc., 64 F.3d 735, 739 (1st Cir. 1995) (citing Int'l Bhd. of Electrical Workers, Local 1228, AFL-CIO v. WNEV-TV, New Eng. Television Corp., 778 F.2d 46, 49 (1st Cir. 1985)). The general rule is "when a collective bargaining agreement contains an arbitration clause, such as the one in this case, 'a presumption of arbitrability [is created] in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved

---

[5]The company objected to the arbitrator determining the scope of his own jurisdiction. However, the company did nothing to attempt to resolve the matter any other way. For example, if the company had a problem with the arbitrator it could have sought the relief it desired in federal court. Instead, it chose to fully participate in the proceedings in terms of both arguing the arbitrability question and the merits. As the arbitrator himself noted, this inaction should not result in any advantage to the company. "If the company wanted to seek judicial interpretation of the arbitration clause, it should have done so in the first instance. It did not." Joint Ex. 11, p. 7.

[6]Significantly, substantive arbitrability concerns only "the narrow circumstance where contracting parties would likely have expected a court to decide the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the courts avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." Shaw's Supermarkets, Inc. v. United Food and Commericial Workers Union, Local 791, AFL-CIO, 321 F.3d 251, 254 (1st Cir. 2003) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 123 S.Ct. 588, 592, 154 L.Ed.2d 898 (1964)). There is no evidence in the STA here that the parties did not expect their disputes regarding matters such as the Arbitrator's jurisdiction to be resolved through arbitration.

in favor of coverage.'" Local 285, Service Employees Int'l Union, AFL-CIO, 64 F.3d at 738 (quoting AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986)). Thus, even after the AT&T case, upon which the company so heavily relies, the fact remains that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration * * *." Id. (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)).

The unique situation presented to the arbitrator here, the necessity of deciding whether one has jurisdiction to decide his own jurisdiction has been addressed on nearly identical facts. See Huber, Hunt & Nichols, Inc. v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 38, 282 F.3d 746, 749-750 (9th Cir. 2002). In Huber, the employer, a general contractor, and the unions entered into a prehire agreement addressing conditions of employment on a particular project that was separate and apart from the pre-existing collective bargaining agreements. Id. at 747-48. Under the special agreement, jurisdictional disputes were to be decided by competing union leadership, and if they could not be resolved, then by international leadership. Id. at 748. Non-jurisdictional disputes were to be resolved by a project-wide arbitrator. Id. The pipefitters regular collective bargaining agreement provided that grievances would be resolved by a committee. Id. The pipefitters filed a grievance against the employer with the committee, claiming that a subcontractor had assigned work to carpenters and laborers that should have been assigned to its pipefitters. Id. The employer filed its own grievance, stating that the union could not bypass the procedures set forth in the special agreement for resolving jurisdictional disputes. Id. Each party refused to appear to arbitrate, and denied the arbitrability of each other's grievances. Id.

The project-wide arbitrator found that he had the power to decide the company's grievance, that there was a jurisdictional dispute, and ordered the union to use the jurisdictional dispute resolution procedure and not arbitration. Id. at 748-49. The committee also issued an award, finding that it had the power to decide the union's grievance and that the work assignment question was not a jurisdictional dispute. Id. at 749. Both parties sought relief in federal court. Id. The Court concluded that there was no jurisdictional dispute, and thus, the project-wide arbitrator had no power to arbitrate the matter. Upon review, the Ninth Circuit found the District Court's conclusions were flawed. Id. at 749-50. Specifically, the Court found that:

> "The district court's arbitrability inquiry contains a fundamental fallacy. The court assumes that it, not the arbitrator, should decide whether or not the work assignment dispute is a 'jurisdictional dispute.' *But this begs the threshold question. 'The proper inquiry for this court is not whether the underlying dispute is arbitrable in and of itself; rather, we must ask whether the overall dispute, which encompasses the underlying dispute, is arbitrable under the terms of the [Agreement].*" Id. at 749-750 (quoting Southern Cal. Dist. Council of Laborers v. Berry Construction, Inc., 984 F.2d 340, 344 (9th Cir. 1993)).

Thus, before the Court reaches the question of whether the arbitrator had the power to arbitrate the dispute, it must first decide if he has the power to decide the arbitrability question himself. See Huber, 282 F.3d at 749. In Huber, the Court of Appeals first reviewed the language in the Agreement, and the fact that under the agreement, "[j]urisdictional disputes are expressly excepted from arbitration and consigned to a non-arbitral resolution procedure." Id. at 750. The lower court had already decided that based upon that language, the Court, and not the arbitrator, had the authority to decide whether any particular grievance involved a jurisdictional dispute. See id. On review, the Ninth Circuit declined to "label the underlying dispute here as

either a jurisdictional or a contractual dispute," and instead looked to "whether the overall dispute is arbitrable." See id. (citing Berry, 984 F.2d at 343).

Significantly, the Court found that:

> "when the [Agreement] consigns all questions concerning the application or interpretation of the Agreement 'excluding jurisdictional disputes' to the Permanent Arbitrator, *it is implicitly assigning to him the threshold determination whether a dispute is jurisdictional*. Under any other interpretation, a trip to court would be necessary whenever the parties disagreed, or even purported to disagree, whether a dispute was 'jurisdictional' in character. It would be impossible to force any party to the [Agreement] into the * * * procedures for resolving jurisdictional disputes without a court order. 'The arbitration clause would be swallowed up by the exception.'" Id. at 750 (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960)).

Finally, the Court of Appeals rejected the district court's evaluation because it had "no business determining the merits of a grievance under the guise of deciding questions of arbitrability." Id. at 751 (citing United Food & Commercial Workers Union, Local 770 v. Geldin Meat Co., 13 F.3d 1365, 1368 (9th Cir. 1994)).

This case is nearly identical to the situation that existed in Huber. Here, the STA expressly assigns to the Arbitrator all non-jurisdictional disputes concerning the application or interpretation of the agreement. Joint Ex. 2, Art. 11 ("Any dispute arising from the performance of this STA * * * shall be settled by the following three step procedure.") It cannot be said with positive assurance that this does not vest the arbitrator with the power to decide, at the outset, that he has jurisdiction over the grievance. And, in this case, this also gives the arbitrator the power to make the determination about whether there was a jurisdictional dispute or not because the issues are intertwined. This is totally consistent with the company's Steelworkers' argument because even if the company did not agree to arbitrate jurisdictional disputes, it did agree, based on the language of the STA, for the arbitrator to make the determination in the first instance as to

whether there was or was not a j]urisdictional dispute. The company implicitly accepted this when it made its own pitch to the arbitrator that the dispute was not jurisdictional - - had the arbitrator accepted its view, there would be no current challenge regarding substantive arbitrability. By making its argument to the arbitrator, the company conceded that the arbitrator had the ability to rule on the question.

This makes sense because if the company's view is accepted, then the parties would have to go directly to Court just to have the substantive arbitrability question addressed which contravenes public policy favoring arbitration and the STA. In fact, even if the agreement did not expressly leave the determination of arbitrability to the arbitrator, and even if company first went to the Court, it is extremely likely that under these circumstances the Court would "have left the initial determination to the arbitrator" in all events. Id. at 281. This is because in this case, arbitrability could not have been decided, it appears, without examining the merits.

> "In these circumstances we believe the matter should proceed to arbitration, where the arbitrator may determine the subsidiary facts upon which depend both the merits of the controversy and his jurisdiction to decide it. A finding of jurisdiction, unlike a finding on the merits when jurisdiction is not in question * * * will not be insulated from subsequent judicial review * * * We believe full recognition of the role of labor arbitration requires court intervention in a case such as this only when it has become absolutely necessary, viz., on a petition to vacate or enforce the award." Id. at 281 (quoting Camden Indus. Co. v. Carpenters Local 1688, 353 F.2d 178, 180 (1st Cir. 1965)).

Deciding the merits, in the context of deciding whether the parties have decided to submit a particular grievance to arbitration is expressly prohibited by AT&T. See 475 U.S. at 649 In this type of a case, it makes more sense for the arbitrator to decide the arbitrability issue first, since, like a question of procedural arbitrability the issue is "inextricably bound up with the merits of the dispute" and thus should be decided along with the merits. Local 185, 64

F.3d at 740. For example, in this case the arbitrator could not determine the question of arbitrability without deciding whether the dispute was jurisdictional or not - - the heart of the case on the merits. See Local 185, 64 F.3d at 740. In other words, if this substantive arbitrability question were to be reserved only for the Court, then the Court would be deciding the merits, a role that contravenes collective bargaining in the first place.

Because the arbitrator had the power to decide the question of initial jurisdiction, then judicial review of the arbitrator's ruling should be as circumspect as its review of the arbitrator's resolution on the merits of the grievance. See R.W. Granger & Sons, Inc. v. Eastern Mass. Carpenters, 686 F.Supp. 22, 25 (D. Mass. 1988) (citing Piggly Wiggly Operators' Warehouse, Inc. v. Independent Truck Drivers Union Local No. 1, 611 F.2d 580, 584 (5th Cir. 1980)); see also Freight Drivers, Helpers, Dockmen & Allied Workers Local 375, at *1.

The Arbitrator's decision is consistent with these principles. The arbitrator first noted that his authority stemmed from the STA. Joint Ex. 11, p. 6. The arbitrator noted that the grievance procedure, applies to "any dispute arising from the performance of the STA, except for a jurisdictional dispute . . . [which dispute] shall be settled by the following three step procedure. The third step permits the grieving party "to elect to have the grievance decided by arbitration." Id. "The agreement then goes on to provide, 'The selected arbitrator shall hear and decide the grievance. The parties agree that, in deciding the grievance, the arbitrator shall not have the authority to change, add to, or delete from the STA * * * No decision by the arbitrator may provide retroactivity beyond sixty days. The arbitrator's decision shall be final and binding." Id.

Based on this language the Arbitrator concluded that "[i]t requires no monumental intellectual effort to infer from such broad language an implied authority to determine whether

or not some particular matter was intended by the parties to be subject under the contract to arbitration." Ex. 11, p. 7. See, e.g., United Steelworkers of Am. v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960) ("it seems proper to read the typical arbitration clause as a promise to arbitrate every claim, * * *, which the complainant bases upon the contract."). Since the parties did not agree to exclude the Arbitrator's power to decide his authority under the agreement, the arbitrability question was properly resolved.

**C. The Arbitrator's Decision Must Be Confirmed.**

*The Grievance Did Not State a Jurisdictional Dispute*

The Arbitrator concluded, based on the facts and evidence presented to him, that there was no jurisdictional dispute. This decision is well-supported and must be confirmed. First, the company itself conceded that the problems with Umling unsafely performing electrical work was not a jurisdictional dispute. In its February 11, 2005, response to Local 99's grievance, Shank stated the following:

> "[w]e have investigated your complaint and can find no basis for processing a grievance under Article 11, or for processing a jurisdictional dispute under Article 7. * * * Moreover, the incident you describe does not involve a jurisdictional dispute under Article 7. Neither IUOE Local 57, nor S/BB, content that any craft except IBEW Local 99 has jurisdiction for performing electrical work. * * * As far as we are concerned, this was an incident which by no means rises to the level of a jurisdictional dispute, of a kind which happens from time to time on every job. Under these circumstances, it appears to us that the best solution is not to talk about inapplicable grievances and jurisdictional disputes, but for our part to instruct Donald Umling to be more careful in his dealings with electricians, working with them to facilitate job progress, not to provoke possible confrontations." Joint Ex. 5.

As the Arbitrator noted, "Local 99 is not grieving the pulling of plugs, operation of starter motors, etc., by other members of the Operating Engineers or Laborers. It is grieving the

actions of Mr. Umling who, as a member of management, has performed work on electrical equipment in violation of clearly marked OSHA prohibitions." Ex. 11, p. 8. The Arbitrator also had before him the fact that the company's position at the hearings had taken a 180 degree turn from its February correspondence, perhaps hoping to avoid arbitration. In addition, no one from the laborers or engineers actually appeared at the hearing to support the company's position that they were claiming a right to the work in dispute.

Armed with these facts, the Arbitrator looked to NLRB precedent regarding what constitutes a jurisdictional dispute. At the initial hearing, the Arbitrator recognized that "if a jurisdictional dispute is one between two unions over a proper allocation of work, this is not it. This is a question of management, a foreman, doing electrical workers' work and an objection to that by the electricians * * *." Joint Ex. 11, p. 8 (quoting Tr. I, p. 21-22). The Arbitrator relied on two NLRB cases which defined a "traditional jurisdictional dispute between two rival groups of employees claiming the same work, with an innocent employer caught in the middle." Joint Ex. 11, p. 8. Critically, there was no rival group claiming the work, and since Umling was a member of management, the company could not be innocent.

This finding, based on the facts, evidence and applicable law, must be confirmed. Significantly, the Arbitrator's conclusion is totally consistent with other NLRB precedent. In the context of NLRB proceedings, the Board and the Courts upon review, are frequently called upon to determine whether a dispute is "actually jurisdictional." See Recon Refractory & Construction Inc. v. NLRB, 424 F.3d 980, 987 (9th Cir. 2005). "In the labor field, th[e] term of art ["jurisdictional dispute"] generally refers to disputes 'involv[ing] a single employer caught between the conflicting demands of two or more unions.'" Huber, 282 F.3d at 748 n. 2 (citing

Assoc. Gen. Contractors, Inc. v. Int'l Union of Operating Eng'rs, Local 701, 529 F.2d 1395, 1397 (9th Cir. 1976)).

The statutory mechanisms regarding resolution of jurisdictional disputes were "designed 'to protect employers from being "the helpless victims of quarrels that do not concern them at all."'" Recon, 424 F.3d at 988 (quoting NLRB v. Radio and Television Broad. Eng'rs Union, Local 1212 (CBS), 364 U.S. 573, 581, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961)). The procedures for resolution "presumes 'that the employer has been placed in a situation where he finds it impossible to secure the benefits of stability from either of these contracts, not because he refuses to satisfy the unions, but because the situation is such that he cannot satisfy them." Id. (quoting CBS at 582). The purpose of the statute was to protect "innocent" employers trapped between two competing unions and not "disputes that are truly between an employer and an union." Id. (quoting Id.). Making a case for a jurisdictional dispute can be so difficult that even when the requirement that there be competing claims to the work by rival groups is technically satisfied, the Board could determine the dispute is not actually jurisdictional. Id. (citing Laborers Int'l Union of N. Am., Local No. 1184 (Golden State Boring), 337 NLRB 157, 158 (2001)).

For example, in National Maritime Union of Am., AFL-CIO v. Puerto Rico Mgmt., Inc., 227 NLRB 1081 (1977), one union alleged that certain work belonged to its members, and not to a second union. Id. at 1082. In order to resolve the dispute, the NLRB had to decide whether there was a true jurisdictional dispute at issue. The Board recognized that:

> "[r]ather than being faced with a situation where two unions are competing over an assignment of work to be made in futuro, or even where an assignment already made has given rise to the dispute, the case here involves the elimination of jobs as a result of a consolidation of management functions under the aegis of one company * * * and the consequent discontinuance of management services of another * * *. This case, therefore, is not one in which the employer makes an assignment of work as between two competing

> unions; but rather is one in which a corporate entity decides for economic reasons that it will allot its management functions to one management firm over another - and ceases doing business with the second firm altogether." Id. at 1082-83.

Thus, the Board determined that there was no jurisdictional dispute which traditionally involved "competing claims between rival groups of employees, and not * * * disputes between a union and an employer where no such competing claim [is] involved." Id. at 1083. Here, it is obvious that the dispute between Brady and Umling is a disagreement between the Union and the employer about whether management should be performing electrical work, when management is not licensed and it is unsafe to do so. This finding should not be disturbed.

*The Arbitrator Correctly Found That Umling was Improperly Performing Bargaining Unit Work.*

Because the Arbitrator correctly found that there was no jurisdictional dispute, he properly addressed the merits. The company continues to suggest that this grievance involved the simple act of throwing a breaker switch and that virtually anyone is capable of, and authorized to, perform that function.[7] However, as the Union sees the matter all breaker switches are not alike. A breaker which controls a coffee pot or a sequence of low voltage lights is fundamentally different from a series of breakers in a 480 volt, restricted access electrical

---

[7]During the hearings, Mr. Shank and Brady engaged in the following colloquy.

"SHANK: My question is, to start a motor, any craft can push a button and the motor will start, isn't that true?

BRADY: Sure.

SHANK: And they don't have to know what's inside that panel?

BRADY: I disagree. Because you've got to know what not to hit. I mean, if you look at the array of electrical equipment in there, there's a lot of exposed parts in there. If you don't know electricity, you're at risk. That's my issue." Tr. II, p. 38-39.

control panel. "The OSHA warnings in question, that equipment is to be operated by 'authorized' person only, clearly require operation by licensed electricians, which Mr. Umling is not." Joint Ex. 11, p. 8. There is no dispute that Mr. Umling was performing this work, and that he is not a licensed electrician.

However, the company now contends that Umling's supervisory status is immaterial since he is also a member of the operating engineers. According to the company, the fact that Umling is a member of the operating engineers makes this a jurisdictional dispute. Significantly, in construction, union membership does not preclude an employee from being characterized as a supervisor and the company did, in fact, identify Umling as a supervisor in its' February 11, 2005 correspondence. Joint Ex. 5. Both Brady and Franzblau testified that they considered Umling, as the only management representative on the third shift, to be supervisory. Tr. II, p. 23, 42, 45. Mr. Shank, testifying for the company, opined that Umling was "a mechanic foreman. He may be a supervisor, that's arguable * * *," but then went on to state that when he's doing electrical work, so-called electrical work, he's doing that work as an operating engineer, not a supervisor. Tr. II, p. 63-64. Based on Umling's direction of a shift, his role as perceived by the work force and the Company's admissions as to his status, the Arbitrator sensibly determined that he must be considered a supervisor.[8]

When the company argues that Umling was performing certain functions in his capacity as an Operating Engineer (as opposed to his capacity as supervisor) it concedes by necessary inference that performance of such functions by a supervisor violates the STA. This would be true regardless of whether the work was that of the Operating Engineers, Electricians or Laborers

---

[8]Significantly, Umling was not called as a witness by the company which raises a presumption that his testimony would have been unfavorable, both as to his supervisory status and his performance of electrical work.

and Umling's conduct becomes a per se violation of the STA, subject to potential grievance by any of the three trades. The only Union to grieve, however, was Local 99 which it did so for the safety concerns set forth herein. The Arbitrator was then tasked with the responsibility of deciding, on the basis of the record before him whether the grievance represents a violation of the STA as it relates to Local 99's members - neither of the other unions having contested Local 99's position in that proceeding.

The company relied heavily upon its May 25, 2005 correspondence and the replies thereto to support its position that "pushing breaker reset buttons is not electrical work." Joint Ex. 9. Since this is a question of supervisory conduct, not a jurisdictional matter, however, it matters little what other unions may think concerning the work, even assuming, arguendo, that Mr. Shank's letter can be read broadly enough to cover the activities engaged in by Umling.[9] Hearsay such as joint exhibit nine may be admissible in arbitration, but standing alone it cannot sustain the employer's burden of proof. The company produced no witnesses and introduced no non-hearsay evidence in support of its position. It failed to produce witnesses from either the Operating Engineers or the Laborers who would testify under oath and be subject to cross-

---

[9]It is important to note that Local 99 was not included in, nor furnished a copy of the May 25 letter prior to arbitration. Even the Arbitrator noted that this May 2005 letter confirming events that allegedly occurred in March 2004 was prepared "quite possibly in preparation for this case." Joint Ex. 11, p. 8.

Furthermore, the fact that this March 2004 event referenced a year later in a series of letters is being characterized by the company as a jurisdictional dispute concerning the same facts that was resolved as a jurisdictional dispute is of no moment. The company's suggestion that a similar set of facts can never give rise to a different grievance must be rejected. Especially here, where the scope of Umling's position and unsafe practices was unknown in March 2004. Furthermore, the company itself admitted that it was no jurisdictional dispute at the time it happened. Joint Ex. 5.

examination concerning their understanding of the scope of Mr. Shank's letter, its applicability to access to the TBM panels, or the supervisory status of Umling.[10]

In this case it fell to the Arbitrator to determine whether there was substantial evidence in the record to establish that the work in question was electrical. The Arbitrator recognized the obvious - the equipment is plainly marked "electrical equipment - 480 volts." This alone raises a presumption that work on that equipment falls within the province of licensed electricians. Additionally, the federal government, acting through OSHA, mandated that only "authorized personnel" be permitted to access the equipment and that the panels be so designated. Even Mr. Shank was compelled to admit that "if you have to go past the front panel, past actually pushing a button, then that work gets into the skill of an electrician and nobody else should be doing it." Tr. II, p. 67-68. The company's problem in this case is that "pushing a button" takes place <u>inside</u> the panel, precisely where the Company admits only electricians should be allowed. Mr. Shank's analogy to a car starter is apt. Tr. II, p. 68. Turning the ignition key is not electrical work, but once you go under the hood (or in the panel) you <u>are</u> engaged in electrical work. This is not an academic distinction. OSHA seeks to restrict access to these panels for one of the same reasons Local 99 objects to a non-licensed supervisor tinkering with electrical equipment - safety on the job.[11]

The testimony brought to light several instances in which safety was jeopardized as a result of Umling's actions. On February 3, 2005, for example, even when electricians were

---

[10]The Union, on the other hand, offered the testimony of Franzblau, an Operating Engineer, to the effect that the regarding work inside the panels as electricians' work which he refused to perform, citing safety concerns, although requested to do so by Umling. Tr. II, p. 47.

[11]There is absolutely nothing in the record to establish that Umling had electrical training or experience of any sort, or that he was "authorized" access the TBM panels.

present, Umling was in the panel "randomly throwing breakers * * * while we were downstairs electrically trying to figure out what was wrong * * *" "If one of us had been in that panel they would have gotten electrocuted." Tr. II, p. 31-32. On another occasion in December 2004, Umling elected to respond to an electrical fire by spraying it with a hose. Tr. II, p. 49. The latter incident, of course, did not involve the TBM panels, but does demonstrate the consequence of unqualified personnel dealing with matters beyond their skill level. If anything further were required to demonstrate that the contract has been violated it would be found in Umling's comments when challenged by union steward Brady on August 24, 2004. "Look, I'm doing the electrical work. I've been doing the electrical work. I'm going to continue doing electrical work. If there's an electrician around I might get him to do it, but if there's not, then I'm going to do it myself."[12] Tr. II, p. 28. As an admission against interest by a supervisor this unrebutted statement alone supports the Arbitrator's decision.[13] Finally, Frazblau testified that Umling frequently performed electrical work and attempted to direct other non-electricians to do the same. Tr. II, p. 46.

As the Arbitrator noted, the Union's claim was "well supported by the evidence." Joint Ex. 11, p. 9. Accordingly, the Award should be confirmed because the Arbitrator acted within his authority by issuing an award that draws its essence from the Agreement and is based upon a passably plausible interpretation of the Agreement. Furthermore, the company has not proven

---

[12]It is critical that Umling never denied that he was doing "electrical work," nor claim that the work he was doing was properly performed by Operating Engineers. Rather, he forthrightly acknowledged that the work was electrical and he was doing it despite that fact. His statement reflects yet another admission about the character of the work.

that the Arbitrator manifestly disregarded the law, that the award was completely irrational, or should otherwise not be enforced.

*D. The Arbitrator's Remedy Must Be Enforced.*

The company's final contention is that the Arbitrator's remedy does not "draw its essence" from the STA. Specifically, the company disagrees with the monetary award and states that assigning an electrician to the third-shift contravenes management rights.

"An arbitrator has broad discretion in formulating remedies." Humility of Mary Health Partners v. Local 377 Chauffeurs, Teamsters, Warehousemen, and Helpers of Am., 296 F. Supp.2d 840, 848 (N.D. Ohio 2003) (citing Misco, Inc., 484 U.S. 29). "If the language of the arbitrable contract is not explicit enough to bar the arbitrator's chosen remedy, the arbitrator's judgment will be respected on review." Id. (citing AK Steel Corp. v. United Steelworkers of Am., 163 F.3d 403, 409 (6th Cir. 1998)).

"The Supreme Court has cautioned courts to be deferential when reviewing the remedies ordered by the arbitrator:

> '[A]n arbitrator * * * is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.'" Bixby Medical Center, Inc. v. Michigan Nurses Assoc., 142 Fed. Appx. 843, 848-49 (6th Cir. 2005) (quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

"The Court has since reiterated the limited role that courts play in this area, noting that 'where it is contemplated that the arbitrator will determine remedies for contract violations that

he finds, courts have no authority to disagree with his honest judgment in that respect.'" Id. at 849 (quoting Misco, 484 U.S. at 38).

Here, the arbitrator was charged with formulating the appropriate remedy for Umling's repeated performance of electrical work causing safety problems, and in violation of the STA. There were provisions in the STA providing that only members of Local 99 were to perform electrical work. The Arbitrator had evidence of safety problems before him and the fact that these problems could be cured by the presence of an electrician on the third-shift. In addition, he found back pay appropriate and since no third-shift electrician existed, then he ordered the back pay award to be shared by the pool of other electricians that should have been performing the work. This remedy does no violence to the STA and thus, the court has no authority to disagree with the arbitrator's honest judgment.

The company agreed to a grievance-arbitration procedure pursuant to which "[t]he selected Arbitrator shall hear and decide the grievance." Joint Ex. 2. Since there is no specific provision in the STA that addresses the remedy for a violation of the contract (allowing supervisor to perform electrical work reserved for Local 99), then there is no conflict.

Here, the company argues that since management rights include the ability to assign whatever number of employees it deems necessary, the arbitrator did not have the authority to add an employee. Joint Ex. 2, Art. 5. However, the arbitrator had to construe both the management rights clause and the provision reserving electrical work to electricians, and safety concerns in fashioning this remedy. Thus, the fact that Article 7 is contained in the same agreement as Article 5 necessarily means that management rights are limited by the fact that electrical work must be reserved to electricians. See, e.g., United Food & Commercial Workers Union Local No. 655 v. St. John's Mercy Health Systems, 2006 WL 1409416, at *2-3 (8th Cir.

2006) (remedy that required hospital to discharge 73 nurses and pay fees and dues to union appropriate despite statute requiring adequate nurse staffing and CBA provision putting obligation to pay dues on nurses themselves); National Gypsum Co. v. Oil, Chemical and Atomic Workers Int'l Union, 147 F.3d 399, 404-05 (5th Cir. 1998) (remedy that required company to bargain over institution of new program despite management rights clause reserving scheduling changes to management is appropriate - - to the extent two provisions are in conflict "the arbitrator had the authority to resolve the conflict in favor of the Union").

Accordingly, there is no basis upon which to vacate the Arbitrator's remedy.

## III. Conclusion.

Reduced to its most basic elements this grievance reflects the fundamental clash between construction management's desire to avoid any delays in the progress of work and its' corresponding interest in keeping costs at a minimum and the Union's interest in project safety and preserving the work of its' members. If a supervisor is able to keep the job running by performing work which would otherwise be done by union workers it serves management's interest, especially here when no electricians were assigned to the third shift. Obviously, to schedule an electrician is an added expense. The solution chosen by the company in this case, to have a supervisor do the work, may be valid and acceptable - - if there were no collective bargaining agreement - - which in this case, there is. The Arbitrator agreed, based on the facts, evidence and arguments presented to him. The decision must be confirmed.

International Brotherhood of Electrical Workers, Local 99
By its attorneys,

__________________________
Gerard P. Cobleigh, #0232
70 Jefferson Boulevard

Warwick, RI 02888
(401) 941-5900
(401) 461-4107 (fax)

Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0966
(401) 421-0964 (fax)

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent by first-class mail to Girard R. Visconti, Esq., Visconti & Boren, Ltd., 55 Dorrance St., Providence, RI 02903 on the 16th day of June 2006.