UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHANK/BALFOUR BEATTY, A Joint Venture of M.L. SHANK COMPANY, INC., and BALFOUR BEATTY CONSTRUCTION, INC. | : | C.A. No.: 06-43ML |
| v. | : | |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 99 a/k/a/ IBEW LOCAL 99 | : | |

**PARTIES' STIPULATION REGARDING UNDISPUTED FACTS AND JOINT EXHIBITS FOR MOTION TO VACATE AND CROSS MOTION TO CONFIRM ARBITRATION AWARD**

The parties, Shank/Balfour Beatty ("Shank") and International Brotherhood of Electrical Workers Local 99 ("Local 99"), stipulate that the following facts and matters are undisputed and the documents identified and attached as Exhibits are authentic and genuine as follows:

1. Shank is a joint venture between two California corporations, M.L. Shank Co., Inc. and Balfour Beatty Construction, Inc. Shank's office and principal place of business is located in Providence, Rhode Island. Shank is an employer engaged in interstate commerce and in an industry affecting commerce within the meaning of section 2(6) and 2(7) of the National Labor Relations Act as amended [29 U.S.C. § 152(6) and (7)] and within the meaning of section 301(a) [29 U.S.C. § 185(a)].

2. Local 99 is a labor organization which represents employees in an industry affecting commerce and its duly authorized officers or agents are engaged in representing

or acting for employee members in, among other areas, Providence, Rhode Island. Local 99 transacts business in Providence, Rhode Island and has an office and place of business in Providence, Rhode Island.

3. The parties stipulate that venue is appropriate in this Court under section 301(c) of the Labor Management Relations Act [29 U.S.C. § 185(c)] and 28 U.S.C. section 1391(b).

4. In 2005, a dispute arose between Shank and Local 99 under a collective bargaining agreement.

5. Local 99 thereafter made a demand for arbitration. Albert G. Murphy was appointed as the arbitrator.

6. Two arbitration hearings were held. A transcript of the arbitration hearing held on May 6, 2005 before Arbitrator Murphy was made. A true and correct copy of the May 6, 2005 arbitration hearing transcript is attached as Exhibit 1.

7. There were three joint exhibits admitted at the May 6, 2005 hearing. Those joint exhibits are as follows:

a. Joint Exhibit 1 – Special Tunnel Agreement. A true and correct copy is attached as Exhibit 2.

b. Joint Exhibit 2 – Grievance. A true and correct copy is attached as Exhibit 3.

c. Joint Exhibit 3 – Demand for Arbitration. A true and correct copy is attached as Exhibit 4.

8. Local 99 submitted an exhibit marked U – 1 at the May 6, 2005 arbitration hearing. A true and correct copy is attached as Exhibit 5.

9. A transcript of the second arbitration hearing held on June 6, 2005 before Arbitrator Murphy was made. A true and correct copy of the June 6, 2005 arbitration hearing transcript is attached as Exhibit 6.

10. Local 99 submitted as exhibits at the second hearing, Union Exhibit 2 through 10. True and correct copies of those exhibits are attached as Exhibits 7 and 8.

11. Shank submitted two exhibits at the second hearing, Company Exhibits 1 (four pages) and 2 (four pages). True and correct copies of those exhibits are attached as Exhibits 9 and 10.

12. On October 10, 2005, Arbitrator Murphy issued an arbitration award. A true and correct copy of the arbitration award is attached as Exhibit 11.

Dated: May 23, 2006

Plaintiff,
Shank/Balfour Beatty, A Joint Venture of M.L. Shank Company, Inc. and Balfour Beatty Construction, Inc.
By their Attorney,

Girard R. Visconti, #0566
Visconti & Boren Ltd.
55 Dorance Street
Providence, RI 02903
(401) 331-3800 (Telephone)
(401) 421-9302 (Facsimile)

Defendant,
International Brotherhood of Electrical Workers, Local 99
By their Attorneys,

Dated: May 23, 2006

Carly Beauvais Iafrate, #6343
170 Westminster St., Suite 601
Providence, RI 02903
(401) 421-0966 (Telephone)
(401) 351-4802 (Facsimile)

Gerard P. Cobleigh, #0232
70 Jefferson Boulevard
Warwick, RI 02888
(401) 941-5900 (Telephone)
(401) 461-4107 (Facsimile)

1

AMERICAN ARBITRATION ASSOCIATION

RE: 11 300 00458 05

IBEW LOCAL 99

and

SHANK/BALFOUR BEATTY

COPY

HEARD BEFORE: ALBERT G. MURPHY, ARBITRATOR

PLACE: OMNI BILTMORE HOTEL
KENNEDY PLAZA
PROVIDENCE, RHODE ISLAND 02903

DATE: MAY 6, 2005

TIME: 10:00 A.M.

APPEARANCES:

COBLEIGH & GIACOBBE
BY: GERARD P. COBLEIGH, ESQ.
Counsel for IBEW Local 99

SHANK/BALFOUR BEATTY
BY: MICHAEL L. SHANK, Pro Se
Counsel for Shank/Balfour Beatty

IN ATTENDANCE:

MR. ALLEN DURAND, BUSINESS MANAGER

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

# I N D E X


| EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| Joint exhibits | | |
| 1 | Photostatic copy of nine-page document titled Special Tunnel Agreement | 3 |
| 2 | Photostatic copy of one-page grievance document dated February 14, 2005 | 3-4 |
| 3 | Photostatic copy of three-page document titled Demand for Arbitration | 4-5 |
| Union exhibit | | |
| 1, I.D. | Photostatic copy of two-page letter of Shank/Balfour Beatty to IBEW Local 99 dated February 11, 2005 | 5 |
| 1, Full | | 23 |

(May 6, 2005, 10:05 a.m.)

(Discussion off the record)

MR. MURPHY: Maybe it's time to go on the record. I will open the hearing at this point. This is American Arbitration File Number 11 300 00458 05, IBEW Local 99 and Shank/Balfour Beatty. Would the parties identify themselves for the record. Mr. Shank.

MR. SHANK: I'm Michael Shank. I'm the managing partner of Shank/Balfour Beatty. And I will be representing Shank/Balfour Beatty, pro se.

MR. MURPHY: Okay. Mr. Cobleigh.

MR. COBLEIGH: Yes. I'm Gerard Cobleigh for IBEW Local 99. We're asking, Joint 1?

MR. SHANK: Joint 1, the collective bargaining agreement, yes.

(PHOTOSTATIC COPY OF NINE-PAGE DOCUMENT TITLED SPECIAL TUNNEL AGREEMENT WAS MARKED JOINT EXHIBIT NO. 1)

MR. MURPHY: Off the record.

(Discussion off the record)

MR. COBLEIGH: As Joint 2 a copy of the grievance.

(PHOTOSTATIC COPY OF ONE-PAGE GRIEVANCE DOCUMENT DATED FEBRUARY 14, 2005 WAS

MARKED JOINT EXHIBIT NO. 2)

MR. COBLEIGH: Your exhibit?

MR. SHANK: No. I think that should be one of your exhibits.

MR. COBLEIGH: Okay.

MR. SHANK: I'm suggesting Joint 3 would be the demand for arbitration.

MR. COBLEIGH: That's right. Do you have those?

MR. SHANK: Excuse me?

MR. COBLEIGH: Do you have those?

MR. SHANK: Yes, J-1, J-2, and J-3.

MR. COBLEIGH: No. I was wondering if you had a copy of the demand before the arbitrator.

MR. SHANK: Yes, I do. You don't have one there?

MR. COBLEIGH: I have one, but I didn't run copies.

MR. SHANK: Oh, okay. Sure.

MR. MURPHY: Okay. In the matter for arbitration, then, this is -- where does this end up?

MR. COBLEIGH: 3.

MR. MURPHY: Is this Joint 3?

MR. COBLEIGH: M-hm. (Affirmative)

(PHOTOSTATIC COPY OF THREE-PAGE DOCUMENT

TITLED DEMAND FOR ARBITRATION WAS MARKED JOINT EXHIBIT NO. 3)

MR. COBLEIGH: Anything else after Joint 3?

MR. SHANK: No.

MR. MURPHY: That's it for exhibits?

MR. COBLEIGH: That's it for joint exhibits.

MR. MURPHY: That's all right.

MR. COBLEIGH: We will have a union exhibit. I believe you have a copy?

MR. SHANK: I have a copy.

MR. COBLEIGH: Okay. We'd offer a response from Mr. Shank dated February of 11th of '05 as Union 1.

MR. SHANK: Well, I'm objecting to that because I think there's a threshold issue of arbitrability here that should be addressed before we proceed even any further.

MR. MURPHY: Well, I think, for the purposes of the record, we'll mark this Union 1 for identification, without ruling on its admissibility.

(PHOTOSTATIC COPY OF TWO-PAGE LETTER OF SHANK/BALFOUR BEATTY TO IBEW LOCAL 99 DATED FEBRUARY 11, 2005 WAS MARKED UNION EXHIBIT NO. 1,

IDENTIFICATION)

MR. MURPHY: And then I'd like to hear from you what your claim of arbitrability is. Are you prepared to make a statement?

MR. SHANK: Yes.

MR. MURPHY: All right.

MR. SHANK: Well, it's plain from the grievance itself electrical work is being done by unlicensed third shift personnel, other than members of IBEW Local Union 99. That's a statement of a jurisdictional dispute. The demand for arbitration is just as clear, the nature of the dispute, electrical work performed by individuals other than members of Local 99 IBEW, by any measure it's a jurisdictional dispute. If we turn to the collective bargaining agreement, Paragraph 11, page 4, first sentence, "Any dispute arising from performance of this STA, except for a jurisdictional dispute, or a violation of Paragraph 10, shall be settled by the following three step procedure," which is the arbitration procedure.

A jurisdictional dispute is specifically excluded from the jurisdiction of the arbitrator by this particular clause. It's not broad. It's narrow. It's specific. The arbitrator cannot hear a

jurisdictional dispute. What we have here is a jurisdictional dispute. And it's clear, now, the law is settled on the fact that one of the parties excludes something from jurisdiction, the arbitrator can't hear it. Going back as far as United Steelworkers against Warrior and Gulf, U.S. Supreme Court 1960, that's been clear. And all subsequent cases deal more or less with how broad the exclusion clause is or how much you can chip away at it. But when the exclusion clause is this explicit, there's simply no room for interpretation. The arbitrator lacks jurisdiction. And we would appreciate a decision accordingly from the arbitrator. But if we don't get it, we are not going to arbitrate it.

MR. COBLEIGH: Is that it?

MR. MURPHY: Are you finished? Okay. Mr. Cobleigh.

MR. COBLEIGH: The Union agrees that jurisdictional disputes are excluded from the arbitration clause and would, therefore, be beyond the jurisdiction of the arbitrator to hear it. What we don't agree on is that this is in jurisdictional dispute. If you will refer to Union Exhibit 1 for identification, you'll see several statements, which we think support our position. I'm referring to the

third paragraph in which the company does indicate that it considers this to be a jurisdictional dispute, but then goes on to say the incident you describe does not involve a jurisdictional dispute. And if you skip down to the next paragraph, you'll see one of the incidents, which give rise to this grievance. And there are a number of them. But about six or seven lines down, the line that begins "off the lights."

MR. MURPHY: Okay.

MR. COBLEIGH: Do you follow that?

MR. MURPHY: Got you.

MR. COBLEIGH: You'll notice it says: Shank/Balfour Beatty's supervisor Donald Umling and Jim Gray. The complaint in this case is that company supervisor, namely, it's Donald Umling, was in this one instance and a number of other instances an unlicensed individual doing bargaining unit work. So it's his role as a supervisor that's in issue, not his role as a member of the operating engineers.

MR. SHANK: Well, it doesn't matter how you slice it. It's still a jurisdictional dispute. The man in question, you agree, is a member of the operating engineers. Just because he happens to be a foreman doesn't change that he's a member of that

craft. So it all falls back to the idea that it's a jurisdictional dispute. We've never admitted otherwise. There's no possible evidence to place it in any other realm. And we don't intend to permit arbitration of it.

MR. COBLEIGH: Well, the arbitrator has a responsibility of ruling on the issue of arbitrability. If he decides that the matter is arbitrable, it's the company's election at that point if they wish to participate in the arbitration proceeding.

MR. SHANK: Well, I don't, I don't think so. We're not talking about procedural arbitration here. We're talking about substantive. And in this case the collective bargaining agreement does not give the arbitrator the power to decide whether or not he has jurisdiction. So I think that's pretty well settled law, too. Unless the parties agree that the arbitrator can decide substantive arbitrability, he can't do it, so.

MR. COBLEIGH: But the arbitrator always rules initially on questions of both procedural and substantive arbitrability. If either side is unhappy with that result, they have a court option to deal with it. And the court would have de novo

jurisdiction on substantive issues, so. But we have to start with a ruling from the arbitrator, either affirmatively or negatively.

MR. SHANK: I'm not objecting to that. All I'm saying is the collective bargaining agreement does not give the arbitrator the power to decide his own jurisdiction. And absent that agreement by the parties he does not have that power.

MR. MURPHY: Let me stick my nose in at this juncture. Under the so-called positive assurance test articulated in the same case that you cited, one of the Steelworker trilogy, there is what amounts to be, if not a presumption, at least a heavy leaning in favor of arbitrability. Now, the basic rule, as I understand it, is that if the grant of power to the arbitrator under the arbitration agreement is sufficiently broad, the arbitrator does have the authority to decide questions of arbitrability, both substantive and procedural. And particularly in a case like this, where it's not a question of whether or not the thing was filed three days late, or whether or not it was in the proper form, but rather going to the guts of the agreement.

And so I would initially state and claim,

if you will, that I do have the authority to rule on a question of substantive arbitrability. Presupposing, and I'm maybe ahead of myself, but I'm presupposing that the grant of authority to the arbitrator is sufficiently broad. And I think at this juncture I'd like to take a look at the arbitration agreement. Do you have the --

MR. COBLEIGH: It's part of Joint Exhibit 1.

MR. SHANK: May I be permitted to read from Warrior and Gulf?

MR. MURPHY: Please do.

MR. SHANK: Where the assertion by the claimant, which in this case would be the union, is that the parties excluded from court determination, that is, they left it up to the arbitrator, not merely to decide the merits of the grievance, but also its arbitrability, vesting power to make both decisions on the arbitrator, a claimant must bear the burden of a clear demonstration of that purpose.

MR. MURPHY: I'm sorry. A clear what?

MR. SHANK: A clear demonstration of that purpose.

MR. MURPHY: All right.

MR. SHANK: And I think subsequent cases

have held that, absent a clear statement in the arbitration agreement that the arbitrator is able to decide his own jurisdiction, then he doesn't have that. The power is not there.

MR. COBLEIGH: Well, I think, as the arbitrator has already quoted in part the language from the Steelworkers' trilogy, says something to the effect that, unless it can be said with positive assurance that the asserted dispute does not fall within the grievance arbitration clause, then the matter must be considered arbitrable.

MR. SHANK: Well, I think Warrior and Gulf is perfectly clear in saying those matters that are excluded, specifically excluded, can't be arbitrated. And, also, it's perfectly, perfectly clear on the proposition that, absent the parties' agreement that the arbitrator can decide jurisdiction, he doesn't have that authority. That's word for word from Warrior and Gulf. And no subsequent case has eroded that. It all, they always get back to Warrior and Gulf.

MR. COBLEIGH: You know, I think the parties are in agreement that if this is a jurisdictional dispute, that you don't have authority to hear it.

definition. And there's also history on this. And there's also a jurisdictional dispute clause in the collective bargaining agreement. If the electricians claim that somebody else is doing electrical work, then they have another avenue to pursue that. They can pursue that under the jurisdictional dispute clause. And they have a duty to do that. They haven't done it.

MR. COBLEIGH: I think, as the arbitrator has indicated, neither the operating engineers nor the laborers are saying, "This is our work." So it's not jurisdictional as far as any of the trades are concerned.

MR. MURPHY: That's my understanding of a jurisdictional dispute. Now, I can be 360 degrees off. But what else is it?

MR. SHANK: Well, in this case I think you are, sir. I'll tell you why.

MR. MURPHY: Better make that 180.

MR. SHANK: Well, in this case the collective bargaining agreement assigns electrical work to the electricians, but we say that what they're claiming is electrical work is not electricians' work. It's a jurisdictional dispute. The beginnings of this came at a meeting with the

building trades about maybe a year ago. And Mr. Durand was there. And he brought up some of the same things that are in the grievance, that individuals other than electricians are doing electrical work. What he called electrical work was pushing buttons, things of that nature. I made it clear at that meeting that the company did not consider that to be electrical work. There were a number of other things that were outlined. That was the beginnings of a jurisdictional dispute. The other crafts at that meeting agreed with the company. They said that's not electrical work.

At that point, that jurisdictional dispute should have proceeded on to resolution, but the electricians never did. Instead, they waited and brought this same dispute in front of an arbitrator. And I've made it clear, I think in my letters, that it was a jurisdictional dispute, and it can't be anything else. The company has assigned work to one craft, and the other crafts don't agree with the electricians. And the electricians have elected not to follow the jurisdictional dispute procedure. Instead they're trying to bring it up in front of the arbitrator. And we're not going to agree to that.

MR. COBLEIGH: Well, I think Mr. Shank's

comments prove our case. He's saying, well, this is not electrical work. Well, that's a defense on the merits of the case. It's not an arbitrability defense. It's saying you filed a claim saying this is electrical work; it's not electrical work. That has nothing to do with jurisdiction.

MR. SHANK: That has everything to do with jurisdiction. That's always the heart of jurisdictional disputes. One craft says this is our work; another craft says it isn't our work. We've set in place the mechanism. We've made an assignment to other crafts to do things that the electricians claim is electrical work. Collective bargaining agreement has a mechanism to carry that forward. The union has elected not to carry it forward. Instead they've tried to bring it up in front of the arbitrator. It is excluded from the jurisdiction of the arbitrator. Moreover, it is an issue of substandard arbitrability, which the collective bargaining agreement does not give the arbitrator the power to decide. And we're going to act accordingly. There are those cases where the respondent agrees that the arbitrator could hear the case on its merits and reserve a right to claim no jurisdiction later, but I don't see it that way. And we're not going to

do that.

MR. MURPHY: Is it your position that if I rule the matter as arbitrable, that you would refuse to participate further?

MR. SHANK: Yes.

MR. MURPHY: I see.

MR. SHANK: We think this strictly falls within the purview of Section 301 of the Labor Management Relations Act. If the union feels that we should be compelled to arbitrate, that's their avenue. But I'm quite confident that we cannot be compelled to arbitrate this matter, and we're not going to do it voluntarily.

MR. COBLEIGH: Well, the union's position is the grievance has been filed. It's been answered. It has been filed for arbitration. The parties have appeared. The company has raised an issue of arbitrability. It's the arbitrator's authority and responsibility to rule on the claim raised by the company.

MR. MURPHY: I think before I get to that point, I would like you, Mr. Cobleigh, to define on the record what you consider to be a jurisdictional dispute.

MR. COBLEIGH: A jurisdictional dispute

would be a conflict or a question among the three crafts on the job as to which of them has authority to perform certain work. No such dispute exists in this case.

MR. MURPHY: As I understand it, the dispute in this case arose when a member of, is it, am I correct, management performed what the union wanted to be its work?

MR. SHANK: No. The dispute arose in this case when we took the position that certain kinds of work that the electricians claimed as electrical work were not. And I spelled out at this meeting with the building trades exactly what those things were. Pushing buttons, resetting breakers, handling electrical cords, removing electrical motors from the tunnel boring machine. Those kind of things did not involve electrical work. They were not electrical work by definition. Mr. Durand was at that meeting. And he said, "Well, I disagree with that." And the other trades said, "Well, we don't. We agree that these particular things are not electrical work." So what began as the first step in a jurisdictional dispute ended right there.

Rather than carrying the thing forward in accordance with the collective bargaining agreement,

there is a jurisdictional dispute procedure. What we're talking about is a jurisdictional dispute by definition. When your company assigns a certain kind of work to a certain trade, another trade disputes it, that is a jurisdictional dispute. And, again, the union could have pursued that. It could have been handled properly to a end. I might point out that the jurisdictional dispute clause in our agreement may not be to the union's liking because the end result is this. If the parties between them can't agree, then the company's assignment of work stays, so.

MR. MURPHY: I'm sorry. Say that again. If the company -- if the parties cannot between them --

MR. SHANK: If the parties, in other words, our jurisdictional dispute procedure leaves it up to the unions to decide among themselves who has jurisdiction. If they can't decide, though, if they can't agree, then the company's original assignment remains in place. Our original assignment of work is that these things that the electricians are claiming is electrical work, we've made it clear were not electrical work. That's our assignment of work. And if the unions can, if the electricians can meet with

the other unions and get them to agree that our assignment is wrong, then we'll abide by whatever the decision is. The electricians have never done that. They failed to follow through with the jurisdictional disputes procedure in the agreement.

MR. COBLEIGH: Well, we certainly understand the position that the company is taking this morning, but we point out to the arbitrator, it's not the position they took in responding to the grievance. If you look again at Union 1, where Mr. Shank says, ". . the incident you described does not involve a jurisdictional dispute. ." And he then goes on to identify the individual involved as a Shank/Balfour Beatty supervisor. So what he said then and what he's saying now don't appear to match up.

MR. SHANK: Well, I think if you read the whole of this letter, you'll understand. What happened was a, basically, a physical confrontation in the tunnel between the electrician's steward and Mr. Umling, who I called a supervisor, but who's a member of the operating engineers, and he's a foreman. The purpose of this letter was to suggest to the union that the best thing would be if we all forgot it. It was an unfortunate event. This was a

conciliatory letter.

The final paragraph states, "Under these circumstances, it appears to us that the best solution is not to talk about inapplicable grievances and jurisdictional disputes, but for our part to instruct Donald Umling to be more careful in his dealings with the electricians, working with them to facilitate job progress, not to provoke possible confrontations. This we have done, and we'd like to consider the incident closed." That was the purpose of this letter. It certainly didn't waive our rights to argue that what's involved here is a jurisdictional dispute. And I can assure you that it is. Moreover, we're here improperly, shouldn't be here at all. We're here because the electricians refused to follow the jurisdictional disputes procedure in the contract.

MR. COBLEIGH: Well, I think that the differences in the parties reading of the contract and the facts are apparent to the arbitrator at this stage. And it would appear that a ruling on arbitrability may be in order.

MR. MURPHY: I think I've already indicated my attitude towards the solution to the problem. It strikes me that this is, if a

jurisdictional dispute is one between two unions over a proper allocation of work, this is not it. This is a question of a member of management, a foreman, doing electrical workers work and an objection to that by the electricians. And it seems to me that that presents a question. It's an arbitrable question of whether or not this is prohibited under the contract. So I'm going to rule that the grievance is arbitrable. Now, are we going to proceed today? Are you prepared to proceed, Mr. Cobleigh?

MR. COBLEIGH: We have one minor problem. Our witnesses worked up all night last night.

MR. MURPHY: Okay.

MR. COBLEIGH: They just got off early this morning. So we're going to need another date, preferably on a Monday, when they won't have worked the night before.

MR. MURPHY: Yes.

MR. COBLEIGH: But we do have an issue with Mr. Shank as to whether or not you're going to join us in that process.

MR. SHANK: Oh, no. I think the arbitrator has already exceeded his powers. He doesn't have the authority to decide this issue. And

we can't be compelled to arbitrate something that we haven't agreed to arbitrate.

MR. COBLEIGH: Well, --

MR. SHANK: So you can proceed if you want with the arbitration, but we're not going to take part in it. Should you get an award from the arbitrator, we will simply move to have it vacated under a Section 301 in federal district court, and the issue will be arbitrability.

MR. MURPHY: All right. I, you know, short of trial by combat, I don't know of any other way of proceeding.

MR. COBLEIGH: Mr. Shank's in much too good a shape for me to take him on in trial by combat, so I'll leave it up to you.

MR. SHANK: Are you kidding? I had the --

THE REPORTER: Off the record?

MR. SHANK: Off the record.

(Discussion off the record)

MR. MURPHY: We can go back on the record for one moment. Number one, I'm going to mark Union 1 as a full exhibit. It's been discussed, if not testified to, at least referred to substantially. And it appears to, it's a document issued from one of

the parties. So I think it comes in as clearly relevant. Now, do either party wish to file a brief?

MR. SHANK: Well, go ahead.

MR. COBLEIGH: I was waiting for your pleasure.

MR. SHANK: Well, I'm thinking.

MR. MURPHY: If I can interject into your thought process, it's very helpful from my perspective to be able to judge exactly what your position is to have it in writing somewhere, but it's entirely up to you.

MR. SHANK: Well, I was wondering, what I was thinking was, have I put enough in the record to sustain our 301 case.

MR. COBLEIGH: May I suggest this? Would you like an opportunity to review the transcript and then decide?

MR. SHANK: No. I think I can decide that now. Yes, I think so. I think a brief would be in order if you've requested that.

MR. MURPHY: All right.

MR. SHANK: But let me ask you this. You've already ruled that you have the authority to decide this.

MR. MURPHY: Right.

MR. SHANK: And, presumably, you will go ahead and decide it ex parte. I'm not going to be here. You will go ahead and render a decision, but on the merits.

MR. MURPHY: Well, number one, there's no evidence on the merits.

MR. SHANK: Well, I know. But, presumably, the union's going to present a case. They're going to bring witnesses, and they're going to do all that. And I'm not going to be here and because I don't have to be. I think everything that needs to be known from there is present in the documents that we have. But I guess my question is that you will hear the case on its merits. And then you will decide the case on its merits because you've already decided arbitrability.

MR. MURPHY: Yes. I think I probably got ahead of myself, or maybe I'm behind myself. Exactly what you're saying is if I've announced, which I have, that I consider the case to be arbitrable, what's to argue from that perspective from this point forward? And I agree with you. Mr. Cobleigh, can you see any point in anything further on a question of arbitrability?

MR. COBLEIGH: No.

MR. MURPHY: All right. Well, then, why don't -- let me retract my remark with respect to filing a brief. I think probably at this juncture the only thing to consider is the merits. And you suggested a hearing on a Monday. Do you want to try and pick that now?

MR. COBLEIGH: Certainly.

MR. MURPHY: Okay. You can either be an interested observer or a participant, depending on --

MR. SHANK: No. I'm too busy, far too busy. But my objection is on record. Our position is on record. Regardless of the arbitrator's decision on the merits, we will not abide by it. Enforcement will have to be compelled under 301 in a district court. So this issue of arbitrability is going to come up again in a 301 proceeding.

MR. COBLEIGH: So our question at this stage, then, is when do you have a Monday available? Mondays are okay?

MR. DURAND: Well, yes, Monday is.

THE REPORTER: Off the record?

MR. COBLEIGH: Yes.

(Discussion off the record)

MR. MURPHY: I've got Monday, May 23rd, when I'm heading for Ireland for a week or so.

MR. COBLEIGH: Why don't we do it when you get back. That comes in the middle of negotiations with a bunch of people. When are you back?

MR. MURPHY: I'm back the June 4th.

MR. COBLEIGH: Would the 6th work?

MR. MURPHY: I think so, but I've got to check on one case. It's assigned with a question mark. Let me check on that.

MR. COBLEIGH: We can leave it up to triple A to firm up the dates.

MR. MURPHY: Yes. Yes. Okay. But, yes. I'll tell, what is it? Molly Brown, isn't it?

MR. COBLEIGH: I believe so.

MR. MURPHY: Let's tell Molly that we're going to aim in on that June 5th, if it's all right with you.

MR. COBLEIGH: All right.

MR. MURPHY: Okay.

(Adjourned at 10:55 a.m.)

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, SC.

BE IT KNOWN that I, Linda F. Oakley, Registered Professional Reporter and Notary Public, reported stenographically the foregoing hearing on arbitration at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the foregoing pages, 3 through 27, inclusive, contain a full, true, and correct transcription of the hearing on arbitration.

I FURTHER CERTIFY that I am not of counsel, nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF I have hereunto subscribed my name this 9th day of May 2005.

Linda F. Oakley
REGISTERED PROFESSIONAL REPORTER
NOTARY PUBLIC

MY COMMISSION EXPIRES:
July 22, 2005

2

EXHIBIT J-1

# SPECIAL TUNNEL AGREEMENT

1. GENERAL: This is a pre-hire Special Tunnel Agreement (STA) between Shank/Balfour Beatty (S/BB) and Laborers' International Union of North America, Rhode Island Laborers District Council, on behalf of Local Union 271 (Laborers); International Union of Operating Engineers, Local Union 57 (Operating Engineer); and the International Brotherhood of Electrical Workers, Local Union 99 (Electricians). The term "Union" or "Unions" shall refer to the Laborers, Operating Engineers, or Electricians, individually or collectively. The term "Parties" shall refer to S/BB and the Unions.

2. APPLICATION, TERM, AND PURPOSE: This STA applies to manufacturing and construction work performed by S/BB for the Main Spine Tunnel and Ancillary Facilities; Contract No. 01:302.06-C; for the Narragansett Bay Commission (Contract), whether S/BB performs the work on-site or off-site, as clarified by Paragraph 9. This STA shall terminate with completion of work on this Contract. This STA shall apply to all work whether on the surface, underground, or off-site. The purpose of this STA is to establish prevailing wages and fringe benefits for the term of the contract; to define the jurisdiction of the three crafts that will perform the work on the contract; to establish a uniform method for settling disputes, and to prevent strikes and lockouts during the term of the Contract; to establish uniform pay provisions and work rules so that S/BB can timely, safely, and efficiently coordinate the work; and to apply the terms of this STA to construction and manufacturing.

3. EMPLOYEES REPRESENTED: S/BB recognizes that the Unions are the sole and exclusive bargaining representatives of all persons employed to perform work covered by this STA, except for the following class of persons: executives, superintendents, engineers, engineering technicians, timekeepers, messengers, office personnel, security guards, emergency medical and first aid attendants, safety personnel; and quality control personnel.

Jim Pirocco
cell # 447-4630
SITE

4. UNION SECURITY: In keeping with S/BB's recognition that the Unions are the sole and exclusive bargaining representatives of all persons employed to perform work covered by this STA, S/BB agrees that (1) employees dispatched to S/BB in accordance with this STA shall be members of the Unions, or shall become members of the Unions after eight (8) continuous days of employment, and shall maintain their Union membership as a condition of employment, (2) upon written request from a Union, S/BB shall discharge any employee who has not applied for Union membership within eight (8) continuous days of employment, or who has not maintained in good standing their Union membership, and (3) for those employees who have furnished signed, legally sufficient forms, authorizing deductions from their wages, S/BB shall deduct Union dues, as well as any other legally authorized deductions on behalf of the Unions, and shall remit these deducted amounts to the Unions in a manner designated by the Unions.

5. MANAGEMENT'S RIGHTS: S/BB shall be solely responsible for managing performance of the work, including, but not limited to: deciding means, methods, and task schedules, for performing the work; hiring, rejecting, laying off, or discharging applicants and employees; judging the numbers of employees required to perform any phase of the work, assigning the numbers of employees it considers necessary for any operation or crew; deciding when overtime work is required and assigning employees to perform that overtime; and the selecting of foremen and general foremen.

6. HIRING OF EMPLOYEES: Each Union shall operate its referral and hiring practices in accordance with its usual policies. Such policies shall be in full compliance with Federal and Rhode Island laws requiring non-discrimination, and equal employment opportunities without regard for race, creed, color, age, sex, or national origin. To obtain the employees that it needs to perform the work, S/BB shall request, and the Unions shall dispatch, applicants for employment. If the Union does not dispatch the required number of qualified applicants within two (2) working days after S/BB's request, S/BB may hire employees from any source, subject to the requirements of Paragraph 4. The Parties agree that any person who is designated as a Foreman (Shifter or Shift Boss), General Foreman, Tunnel Boring Machine (TBM) Operator, TBM Mechanic, Survey Party Chief or Instrumentman, or TBM Electrician, is a key

man who S/BB may request by name, and who the Union shall dispatch to S/BB. S/BB shall employ apprentices in accordance with Rhode Island regulations, and with the Unions' practices. Pay scales for apprentices shall be as established by the Unions' industrywide collective bargaining agreements. The Parties agree that the manufacturing and construction work contemplated by this STA offers employment opportunities to residents of Rhode Island, including residents who have graduated from, or are participants in, approved training and apprenticeship programs operated by the Unions. S/BB agrees that it will endeavor to hire such Rhode Island residents, consistent with the hiring obligations of this STA, and with S/BB's needs for skilled and experienced craftsmen and apprentices.

7. JURISDICTION: S/BB shall assign jurisdiction for the work as follows:

A. In general, the Operating Engineers shall have jurisdiction for operating the TBM, tunnel locomotives, concrete pumps, all cranes, excavators, backhoes, front end loaders, skid steer loaders (Bobcats), forklifts, dozers, graders, compressors, engine driven pumps, generators, mine utility trucks, and raise boring machines. The Operating Engineers shall have jurisdiction for maintaining equipment; and for performing layout, fitting, burning, and welding in connection with manufacturing plant and equipment; and for surveying (except surveying requiring the use of a Rhode Island Registered Professional Land Surveyor).

B. In general, the Electricians shall have jurisdiction for performing electrical work required for manufacturing equipment and for construction of the work.

C. In general, the Laborers shall have jurisdiction for performing laborers/miners work required for manufacturing equipment and for construction of the work.

There shall be no strikes, work stoppages, or slow-downs, or other disruptive activity, arising from any jurisdictional dispute. Should a jurisdictional dispute arise, the dispute shall be settled by the Unions themselves, and S/BB shall be bound by that settlement. No settlement, however, shall result in S/BB having to employ a double crew, or to use more employees than the minimum required to perform the work, nor

shall it result in S/BB having to use employees who are not qualified to perform the work. If the Unions cannot reach any settlement, S/BB's original assignment shall remain in effect.

8. SUBCONTRACTORS: Subcontractors performing work covered by this STA, shall agree in writing to be a party to, and be bound by, the terms of this STA, regardless of any other collective bargaining agreements to which they may be signatory, or the lack thereof.

9. OFF-SITE WORK: If there is insufficient room at the site, S/BB may manufacture plant and equipment off-site, in which case this STA shall apply to S/BB's work off-site. This STA shall not apply, however, to manufacturers, machine, shops, vendors, and the like, with which S/BB may do business in connection with its manufacturing. If S/BB uses precast concrete segments to support the tunnel, these segments will be produced off-site by a subcontractor, and this STA shall apply to that work.

10. WORK STOPPAGES AND LOCKOUTS: The Unions and their members shall not encourage, condone, participate in, or cause, any strikes, picketing, work stoppages, or other disruptive activity, for any reason, against S/BB, or its subcontractors. Except, it shall not be in violation of this STA for a Union to withdraw its members from the employer, if, after written notification from a Union, S/BB, or any of its subcontractors, fails or refuses to pay its employees, or fails or refuses to pay fringe benefits on their behalf. S/BB shall not carry out a lockout against the Unions, or their members, for any reason.

11. GRIEVANCE PROCEDURE: Any dispute arising from performance of this STA, except for a jurisdictional dispute, or a violation of Paragraph 10, shall be settled by the following three step procedure. Step 1. The grieving Party shall notify the other Party in writing of the grievance, explaining the nature of the grievance and the remedy sought. Within five (5) working days after the grievance has been filed in writing, the Business Manager of the Union, and one representative from S/BB, each having authority to settle the grievance, shall meet in an effort to settle the grievance. Step 2. Should these designated representatives reach an impasse, it is agreed that the

grievance shall be referred to the International Representative for the Union, and to M. L. Shank, Managing Partner, S/BB, in an effort to achieve resolution. Step 3. Should the best efforts of the Parties fail to achieve resolution within ten (10) working days after the grievance has been filed in writing, the grieving party may elect to have the grievance decided by arbitration. Should the grieving party so decide, it shall notify the other Party in writing within seven (7) working days after reaching Step 2 impasse. Unless the foregoing written deadlines have been extended by mutual agreement, in writing, failure to meet a deadline shall render the grievance null and void. After a Party has issued its letter of intent to seek arbitration, the Parties shall jointly and promptly request that the American Arbitration Association (AAA) furnish a panel of seven (7) prospective arbitrators, experienced in construction, from which the Parties will select one arbitrator by a process of striking off names. The selected arbitrator shall hear and decide the grievance. The Parties agree that, in deciding the grievance, the arbitrator shall not have the authority to change, add to, or delete from, the STA. Each Party shall bear all the costs of presenting its own case, and the arbitrators invoiced cost shall be divided equally between the Parties. Any dispute not called to the attention of the non-grieving Party in writing within ten (10) working days after its first occurrence shall be deemed to be waived. No decision by the arbitrator may provide retroactivity beyond sixty (60) days. The arbitrator's decision shall be final and binding.

12. <u>STEWARDS:</u> Each Union may appoint in writing a job steward who shall be a working employee of S/BB, and who shall perform the steward's duties in addition to his/her regular working duties. The Unions agree that they shall appoint stewards working on tasks such that performance of the steward's duties shall not interfere with normal flow and pace of the work. S/BB agrees that it shall provide two (2) days notice in writing before laying off or discharging any steward (except in a case where the steward's bad conduct would require the immediate discharge of any other employee); and that it shall provide work on the project for the steward so long as there is work on the project that the steward is qualified to perform. If the steward observes what he/she believes to be a violation of the STA, the steward shall call that violation to the attention of the Union for resolution. In no case shall the steward take disruptive job action to remedy any alleged violation on his/her own. Such job action

shall be sufficient cause for discharge. In addition to any other pay that the steward may receive, the steward shall receive an additional one-half (1/2) hour at the overtime rate to enable performance of the steward's duties.

13. WAGES AND FRINGE BENEFITS: Wages and fringe benefits shall be paid as set forth in Schedule A. If, during the term of this STA, the industrywide collective bargaining agreements containing the Schedule A wages and fringe benefits shall expire, and if new industrywide collective bargaining agreements are negotiated which have increased wages and fringe benefits, such industrywide increased wages and fringe benefits shall apply to this STA. The Unions agree that they will negotiate no increased wages and fringe benefits that would be over and above the industrywide increased wages and fringe benefits, that would be applied to work under this STA. If the Unions strike the industry as the result of the expiration of any collective bargaining agreement, such strike shall not be applied to S/BB. S/BB shall continue working through any such strike, and agrees to pay retroactively any increased wages and fringe benefits for work performed during the strike.

14. PAY PROVISIONS: Employees working on day shift shall receive 8 hours pay for 8 hours worked, exclusive of a ½ hour non-paid lunch period; employees working on swing shift shall receive 8 hours pay for 7 ½ hours worked, exclusive of a ½ hour non-paid lunch period; employees working on graveyard shift shall receive 8 hours pay for 7 hours worked, exclusive of a ½ hour non-paid lunch period. Any employee required to work through the lunch period shall be paid ½ hour at time and one-half. For employees working in the tunnel, time paid shall begin and end at the top of the shaft. All daily and Saturday overtime shall be at time and one half; daily overtime applying to time worked in excess of ten (10) hours, and Sunday or Holiday overtime, shall be at double time. Friday's graveyard shift shall end on Saturday morning, and Saturday overtime will begin only on Saturday's day shift; the same applies to Saturday's graveyard shift and Sunday's day shift. Any employee reporting to work and, for no fault of his/her own, is provided no work, shall receive two (2) hours show-up pay; any employee beginning work, and for no fault of his/her own, cannot complete the first half of the shift, shall receive four (4) hours pay; any employee beginning work after lunch and, for no fault of his/her own, cannot complete the shift,

shall be paid eight (8) hours. S/BB shall start the various shifts to suit job requirements, and start times for various crews may be staggered to meet job requirements. No employee shall be required to work a split shift. Each employee shall be paid weekly by check. Any employee laid off or discharged shall be paid in full upon layoff or discharge, provided that the employee is present at the jobsite to receive his/her pay. If the employee is not present, S/BB may make other arrangements with the employee to convey the pay; or may remit the pay by the U.S. Postal Service.

15. HOLIDAYS: The following days shall be recognized as holidays:

| Laborers | Operating Engineers | Electricians |
| --- | --- | --- |
| New Year's Day | New Year's Day | New Year's Day |
| Memorial Day | Memorial Day | Memorial Day |
| July 4th | July 4th | July 4th |
| VJ Day | VJ Day | VJ Day |
| Labor Day | Labor Day | Labor Day |
| Columbus Day | Columbus Day | Columbus Day |
| Veterans Day | Veterans Day | Veterans Day |
| Thanksgiving Day, and the day after | Thanksgiving Day, and the day after | Thanksgiving Day, and the day after |
| Christmas Day | Christmas Day | Christmas Day |

For these holidays, or the days on which the holidays are celebrated, each Laborer and Operating Engineer shall be paid eight (8) hours at straight time for the holiday.

16. PERSONAL PROTECTIVE GEAR: S/BB shall furnish, at its own expense, hard hats, ear plugs, safety glasses, rubber rain gear, rubber boots, rubber gloves, welding gloves, replacement glasses for welding hoods, flashlights, respirators, air hoods, and any similar equipment required to protect employees from the hazards of the workplace. There will be a checkout system for these items, and, to obtain a free replacement, the employee must return the worn-out, broken, or otherwise unusable, item that was previously issued.

17. CHANGEHOUSE: S/BB shall furnish a clean, heated, changehouse, having showers, toilets, wash basins, and lockers, sufficient to accommodate all persons working at the site. This changehouse shall be maintained by a member of the Laborers.

18. SAFETY: S/BB shall carry out a Safety, Accident Prevention, and Injury Prevention Program, in accordance with Federal and Rhode Island laws, and with the requirements of the Contract.

19. ALCOHOL AND DRUGS: Tunneling is recognized as inherently hazardous work, and it is recognized that employees working under the influence of alcohol and drugs significantly contribute to accidents in the workplace. To best protect all of its employees, S/BB shall prohibit the use of any alcohol or drugs anywhere on the site. In addition, the Unions agree that, insofar as possible under the laws of Rhode Island, they will work in good faith with S/BB to establish an effective drug screening program that will identify, and keep from the workplace, employees who are drug users and thereby jeopardize the safety of every other employee.

20. ENTIRE AGREEMENT: This STA is the entire and only agreement between the Parties, and it supersedes any other verbal or written understandings or agreements. The Parties intend that this STA shall not violate any applicable Federal or Rhode Island law, but if any part is held to violate such law, only that part shall be considered to be void, but the remainder of the STA shall remain in full force and effect.

21. AGREEMENT: The following authorized persons bind the Parties to this STA:

______________________ Date: 3-8-02

Agreed To by the Rhode Island Laborers District Council on Behalf of Laborers Local 271

______________________ Date: 3-11-02

Agreed To For Operating Engineers Local 57

______________________ Date: 3-21-02

Agreed To For IBEW Local 99

______________________ Date: 11 March 02

Agreed To For S/BB

22. Subcontractors Agreement: By signing in the space provided below, the named subcontractor agrees to be a party to, and to be bound by, the terms of this STA, in accordance with Paragraph 8.

______________________ ______________________

Subcontractor Agreed to for Subcontractor

Date: ______________

3

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 99

22 Amflex Drive
Cranston, RI 02921
(401) 946-9900
(888) ORGANIZE
(401) 946-9907 fax
WWW.IBEW99.ORG

ALLEN P. DURAND
BUSINESS MANAGER

MICHAEL K. DALEY
PRESIDENT

JOHN P. SHALVEY
ORGANIZER
PUBLIC RELATIONS

EXHIBIT
I-2

Mr. Mike Shank
Shank/Balfour and Beatty
220 Terminal Road
Providence, RI.

February 14, 2005

Re: Grievance

**Name of Grievant;**
Allen P. Durand, Business Manager/Financial Secretary

**Statement of The Grievance**
Electrical work on the Combine Sewer Overflow Abatement Project has been done, and is continuing to be done by unlicensed 3rd shift personnel other than members of IBEW Local Union 99 in violation of the Special Tunnel Agreement and The State of Rhode Island licensing laws, with the knowledge and apparent approval of Michael Shank, Managing Partner, S/BB.

**Applicable Contract Provisions:**
Special Tunnel Agreement, Paragraph 1, Paragraph 2, Paragraph 5, Paragraph 6, Paragraph 7, Paragraph,8 Paragraph 11, Paragraph 13, Paragraph 14, and Paragraph 20, and any other relevant paragraphs.

**Remedy Sought:**
The total wages and benefits which would have been paid to an IBEW Local Union 99 licensed Journeyman Electrician on the 3rd shift from the evening that the shift started on June 9, 2004, until such time as there is no longer a 3rd shift, or such time that an electrician is placed on it. These wages and benefits shall be divided equally among those electricians employed on the C.S.O. project during the length of the 3rd shift's existence, but who were never assigned to work on it.

Sincerely,

Allen P. Durand
Business Manager/Financial Secretary

4

# American Arbitration Association

EXHIBIT
13

☐ *MEDIATION Please consult the AAA regarding mediation procedures. If you want the AAA to contact the other party and attempt to arrange a mediation, please check this box.*

**Voluntary Labor Arbitration Rules**

**DEMAND FOR ARBITRATION**

Date: February 25, 2005

To: Name Shank/Balfour Beatty
Address 220 Terminal Road
City and State Providence, RI Zip Code 02905
Telephone (401) 941-1494 Facsimile (401) 941-1498

Name of Representative M.L. Shank
Representative's Address (Same)
City and State (Same) Zip Code
Telephone (401) Facsimile (401)

The named claimant, a party to an arbitration agreement contained in a written contract dated ______________, providing for arbitration under the Voluntary Labor Arbitration Rules, hereby demands arbitration thereunder.

(Attach the arbitration clause or quote it hereunder.)

- See Attached -

NATURE OF DISPUTE: Electrical work performed by individuals other than members of Local 99 IBEW.

CLAIM OR RELIEF SOUGHT (Amount, if Any): Cease and desist, contract compliance, compensation and other relief as appropriate.

HEARING LOCALE REQUESTED: Providence, Rhode Island

You are hereby notified that copies of our arbitration agreement and of this demand are being filed with the American Arbitration Association at its Boston office with the request that it commence the administration of the arbitration. Under the rules, you may file an answering statement after notice from the administrator.

Signed [signature] Title Attorney

Name of the Claiming Union or Employer IBEW Local 99
Address (to Be Used in Connection with This Case) 22 Amflex Drive
City and State Cranston, Rhode Island Zip Code 02921
Telephone (401) 946-9900 Facsimile (401) 946-9907
Name of Representative Gerard P. Cobleigh
Name of Firm Cobleigh & Giacobbe
Representative's Address 70 Jefferson Boulevard
City and State Warwick, RI Zip Code 02888
Telephone (401) 941-5900 Facsimile (401) 461-4107

13

work. If the Unions cannot reach any settlement, S/BB's original assignment shall remain in effect.

8. SUBCONTRACTORS: Subcontractors performing work covered by this STA, shall agree in writing to be a party to, and be bound by, the terms of this STA, regardless of any other collective bargaining agreements to which they may be signatory, or the lack thereof.

9. OFF-SITE WORK: If there is insufficient room at the site, S/BB may manufacture plant and equipment off-site, in which case this STA shall apply to S/BB's work off-site. This STA shall not apply, however, to manufacturers, machine, shops, vendors, and the like, with which S/BB may do business in connection with its manufacturing. If S/BB uses precast concrete segments to support the tunnel, these segments will be produced off-site by a subcontractor, and this STA shall apply to that work.

10. WORK STOPPAGES AND LOCKOUTS: The Unions and their members shall not encourage, condone, participate in, or cause, any strikes, picketing, work stoppages, or other disruptive activity, for any reason, against S/BB, or its subcontractors. Except, it shall not be in violation of this STA for a Union to withdraw its members from the employer, if, after written notification from a Union, S/BB, or any of its subcontractors, fails or refuses to pay its employees, or fails or refuses to pay fringe benefits on their behalf. S/BB shall not carry out a lockout against the Unions, or their members, for any reason.

11. GRIEVANCE PROCEDURE: Any dispute arising from performance of this STA, except for a jurisdictional dispute, or a violation of Paragraph 10, shall be settled by the following three step procedure. Step 1. The grieving Party shall notify the other Party in writing of the grievance, explaining the nature of the grievance and the remedy sought. Within five (5) working days after the grievance has been filed in writing, the Business Manager of the Union, and one representative from S/BB, each having authority to settle the grievance, shall meet in an effort to settle the grievance. Step 2. Should these designated representatives reach an impasse, it is agreed that the

grievance shall be referred to the International Representative for the Union, and to M. L. Shank, Managing Partner, S/BB, in an effort to achieve resolution. Step 3. Should the best efforts of the Parties fail to achieve resolution within ten (10) working days after the grievance has been filed in writing, the grieving party may elect to have the grievance decided by arbitration. Should the grieving party so decide, it shall notify the other Party in writing within seven (7) working days after reaching Step 2 impasse. Unless the foregoing written deadlines have been extended by mutual agreement, in writing, failure to meet a deadline shall render the grievance null and void. After a Party has issued its letter of intent to seek arbitration, the Parties shall jointly and promptly request that the American Arbitration Association (AAA) furnish a panel of seven (7) prospective arbitrators, experienced in construction, from which the Parties will select one arbitrator by a process of striking off names. The selected arbitrator shall hear and decide the grievance. The Parties agree that, in deciding the grievance, the arbitrator shall not have the authority to change, add to, or delete from, the STA. Each Party shall bear all the costs of presenting its own case, and the arbitrators invoiced cost shall be divided equally between the Parties. Any dispute not called to the attention of the non-grieving Party in writing within ten (10) working days after its first occurrence shall be deemed to be waived. No decision by the arbitrator may provide retroactivity beyond sixty (60) days. The arbitrator's decision shall be final and binding.

12. STEWARDS: Each Union may appoint in writing a job steward who shall be a working employee of S/BB, and who shall perform the steward's duties in addition to his/her regular working duties. The Unions agree that they shall appoint stewards working on tasks such that performance of the steward's duties shall not interfere with normal flow and pace of the work. S/BB agrees that it shall provide two (2) days notice in writing before laying off or discharging any steward (except in a case where the steward's bad conduct would require the immediate discharge of any other employee); and that it shall provide work on the project for the steward so long as there is work on the project that the steward is qualified to perform. If the steward observes what he/she believes to be a violation of the STA, the steward shall call that violation to the attention of the Union for resolution. In no case shall the steward take disruptive job action to remedy any alleged violation on his/her own. Such job action

5

**Shank/Balfour Beatty**
Providence CSO Tunnel
220 Terminal Road, Providence, RI 02905
Tel: (401) 941-1495 / Fax: (401) 941-1498

EXHIBIT
Io
2.1

IBEW Local 99
22 Amflex Drive
Cranston, RI 02921

Via Fax (401) 946-9907

February 11, 2005

Attention: Mr. Allen P. Durand
Business Manager

Dear Mr. Durand:

Please refer to your letter dated February 7, 2005, notifying S/BB of a grievance per Article 11 of the Special Tunnel Agreement, continuing on to complain that the grievance involves a violation of Article 7, Jurisdiction, alleging that an Operating Engineer performed Electrician's work.

We have investigated your complaint and can find no basis for processing a grievance under Article 11, or for processing a jurisdictional dispute under Article 7.

You are claiming a violation of Article 7, Jurisdiction, but Article 11, Grievance Procedure, in its first sentence, excludes coverage of jurisdictional disputes. This dispute cannot go forward under Article 11. Moreover, the incident you describe does not involve a jurisdictional dispute under Article 7. Neither IUOE Local 57, nor S/BB, contend that any craft except IBEW Local 99 has jurisdiction for performing electrical work.

What happened in this case is that at approximately 10:30 PM on February 3, 2005, two electricians were installing communications cable using the elevated work platform on TBM Gantry Car 7. The ladder access to the platform is adjacent to the 110 volt distribution panel for the entire TBM electrical system. To the best of our knowledge, when the electricians descended the ladder from the elevated platform, one of them must have accidentally bumped the 110 volt panel master switch to the "off" position, turning off the lights and motor control systems. S/BB supervisors Donald Umling and Jim Gray came back to Gantry Car 7 to find out what had happened to the electrical system. Upon arriving on the scene, Umling noticed that the master switch was "off" and not locked out, so he turned the switch "on", the electrical system came back on, and the crew was back in business. When the electrical system went off in the first place, evidently the electricians did not notice that the master switch had been accidentally bumped "off", instead going to an emergency stop shutoff panel on the same Gantry Car 7 to see if some malfunction had caused the outage. After Umling turned the switch "on", there was a verbal confrontation between Umling and electrician job steward Patrick Brady, during which we are confident that both men said things that would have been better left unsaid.

As far as we are concerned, this was an incident which by no means rises to the level of a jurisdictional dispute, of a kind which happens from time to time on every job. Under these circumstances, it appears to us that the best solution is not to talk about inapplicable grievances and jurisdictional disputes, but for our part to instruct Donald Umling to be more careful in his dealings with the electricians, working with them to facilitate job progress, not to provoke possible confrontations. This we have done, and we would like to consider the incident closed.

Very truly yours,

M. L. Shank
Managing Partner

C.C. Dick Houlihan, IUOE Local 57
Larry Ryan, Ryan Electric

6

AMERICAN ARBITRATION ASSOCIATION

RE: 11 300 00458 05
IBEW LOCAL 99
and
SHANK/BALFOUR BEATTY

GRIEVANCES: ELECTRICAL WORK PERFORMED BY INDIVIDUALS

PLACE: SHERATON INN AIRPORT HOTEL
1850 POST ROAD
WARWICK, RHODE ISLAND

DATE: JUNE 6, 2005

TIME: 10:00 A.M.

HEARD BEFORE: ALBERT G. MURPHY, ARBITRATOR

APPEARANCES:

COBLEIGH & GIACOBBE
BY: GERARD P. COBLEIGH, ESQUIRE
SHANK/BALFOUR BEATTY
BY: MICHAEL L. SHANK, PRO SE
Counsel for Shank/Balfour Beatty
IN ATTENDANCE:
MR. ALLEN P. DURAND, BUSINESS MANAGER

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

I-N-D-E-X


| PATRICK BRADY | PAGE |
|---|---|
| Examination by Mr. Cobleigh. . . . . . . . . . | 4 |
| Examination by Mr. Shank . . . . . . . . . . . | 33 |
| Examination by Mr. Cobliegh. . . . . . . . . . | 42 |

| WOLFGANG FRANZBLAU | PAGE |
|---|---|
| Examination by Mr. Cobleigh. . . . . . . . . . | 43 |
| Examination by Mr. Shank . . . . . . . . . . . | 50 |

| MICHAEL L. SHANK | PAGE |
|---|---|
| Examination by Mr. Cobleigh. . . . . . . . . . | 65 |


E-X-H-I-B-I-T-S


| UNION NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Pamphelt | 15 |
| 2 | 14 Photographs | 15 |
| 3 | One Photo | 15 |
| 4 | One Photo | 17 |
| 5 | One Photo | 18 |
| 6 | One Photo | 18 |
| 7 | One Photo | 18 |
| 8 | One Photo | 18 |
| 9 | One Photo | 18 |
| 10 | One Photo | 18 |

E-X-H-I-B-I-T-S

| COMPANY NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Letter dated May 25, 2005 to LIUNA Local 271 from M.L. Shank | 62 |
| 2 | Employers Monthly Contribution Report | 64 |

(Original Union Exhibit 1 and Company Exhibits 1 and 2 were retained by Mr. Murphy.)
(Original Union Exhibits 2 through 10 were retained by Mr. Cobleigh.)

MR. MURPHY: Okay, on the record. Good morning, this is a second hearing in the case of IBEW, Local 99 and Shank/Balfour Beatty.

Off the record.

(Discussion was held off the record.)

MR. MURPHY: Back on the record. Mr. Cobleigh, are you ready to proceed?

MR. COBLEIGH: Ready to proceed.

MR. MURPHY: All right. Previously at the previous hearing, as the transcript will indicate, there was a finding by myself that the matter was arbitrable and we are proceeding forward on that basis. Mr. Cobleigh?

MR. COBLEIGH: As the first witness, Mr. Patrick Brady.

PATRICK BRADY,

having first been duly sworn by the Arbitrator, testified as follows:

EXAMINATION BY MR. COBLEIGH:

Q. Could you recount for the arbitrator your education and experience, Pat?

A. I have a Bachelor of Science degree from the University of Rhode Island in business administration. I have a Master of Science degree from the University of Rhode Island in labor and

industrial relations. I have a lifetime certificate in vocational electrical education. I've been trained to teach the OSHA, ten-hour construction safety course, and I have had a bunch of other odds and ends over the years.

Q. What has your training been in the electrical field?

A. I have a journeyman electrician's license. I have a master electrician's license. My training basically includes my experience. I've been a member of the Local 99, the IBEW for 35 years. Up until June of 2003, for the previous eight years to that, I was a training director for the IBEW Local 99 Joint Apprenticeship and Training Committee. And that involved running the apprenticeship school plus doing all the professional development courses and skills for the members. Prior to that, I taught at the electrical shop at a local high school for eight years.

Q. Are you licensed by the State of Rhode Island?

A. Yes. The two licenses that I have as a journeyman and master are the Rhode Island licenses. Those licenses also require every three years I have a fifteen-hour professional

development update in order to maintain the National Electrical Code.

Q. Are you currently employed by Ryan Electric?

A. Yes, I am currently employed by Ryan Electric Construction Company.

Q. Where do you work?

A. I work at the Shank/Balfour Beatty CSO project, the tunnel for the waste water treatment tunnel in the City of Providence.

Q. How long have you been so employed?

A. I've been employed since April 5th, 2004.

Q. Okay. What are your work hours?

A. The work hours -- I've been on the second shift -- the work hours vary. Usually a couple of days a week we work -- depending on the process involved -- a couple of days a week we work through the evening for fourteen or fifteen hours. The schedule shift is from 5:00 till 1:00 in the morning.

Q. Are there other shifts on the job?

A. Yeah, there are three shifts.

Q. What are the hours of the other shifts?

A. The first shift runs from roughly 6:30 in the morning till 6:30 at night. The electrical shift, second shift, the electrical second shift runs

from 5:00 to 1:00. There are other shifts from the other trades that I'm not really sure -- I'm not sure what the times are but I know they get over at 10:30.

Q. Okay. Is there a third shift on the project?

A. Yes.

Q. What are the hours for that shift?

A. That shows up, to the best of my knowledge, at 10:30 and it runs through the evening. I'm not sure what time they get out.

Q. Are there electricians on the other shifts?

A. There's electricians on the first shift. There's electricians on the second shift. There are no electricians on the third shift.

Q. How many electricians work on each shift?

A. I have a cold. The first shift there are two electricians working in the tunnel below ground. There are two electricians that work above ground. In the second shift there are two electricians working throughout the job site and there's no electricians on the third shift.

Q. Other than the electricians you've mentioned, are there any other licensed electrical personnel on the job?

A. No, not on a regular basis. If someone is to

be out on vacation, Ryan Electric may call somebody in, but as a rule, those figures that I mentioned earlier are the limit.

Q. Let me show you a flier, if you will, that describes the project. Would you indicate to the arbitrator what that is.

A. Well, this is the location plan. You start at the bottom of the graph there where that line begins is at that the field point, right next to the existing Providence Sewage Treatment Plant.

MR. COBLEIGH: Do you have any objection if I give the arbitrator a copy of this?

MR. SHANK: No, not at all.

MR. MURPHY: Is this coming in as a Joint Exhibit?

MR. COBLEIGH: What is your preference?

MR. SHANK: Excuse me?

MR. COBLEIGH: What is your preference with regard to this exhibit? Do you want to make it a joint exhibit?

MR. SHANK: Just a Union, Union 2.

Q. Why don't you go ahead and explain what the exhibit represents.

A. Okay. Speaking just as a worker on the tunnel, I'm not familiar with the engineering or

anything like that, but at the bottom of that graph where it says, General Location Plan, where that line starts, the heavy black line or in your case a blue line, that is the Field's Point. Right next to the Field's Point is the Providence Sewage Treatment Center. At that point there are three vertical shafts that go down roughly 300 feet, between 50 to 300 feet.

From one of those shafts, the main shaft, lateral you have a 30-foot-diameter tunnel going out following upwards in that graph that's basically following Allens Avenue. At the very top of it where it bears off to the left and ends, that is over off Promenade Street near Bath Street. That's the target tunnel. That's where this section of the project begins and that's where it ends.

Each of those narrower arrows pointing to spots along that line refer to auxiliary tunnels that are branching off from the main tunnel and they hit different shafts at different locations along the three -- it goes on for a little over three miles, I believe.

Q. On the reverse of the exhibit, are there descriptions of the extent of the project and the

means by which it is accomplished?

A. Okay. It says it's 16,000 feet long. It's 26 feet in diameter. The tunnel will hold more than 60 million gallons of combined sewage and the cost of the initial Phase 1 of the project is $314 million dollars. The tunnel boring machine, the TBM, will dig the tunnel 250 feet below the ground and more than 60 feet into the bedrock. The TBM is 30 feet in diameter, and including trailing gear, is approximately 255 feet long and weighs over 690 tons.

Q. Okay. Do you currently hold a position with the Union on the job?

A. On this job I am the Union Steward for Local 99, the IBEW Local 99.

Q. I'm going to show you a series of photographs.

MR. SHANK: If you're offering these as evidence, I have no objection.

MR. COBLEIGH: I just want to give these to the arbitrator to give him some concept of how the job works.

MR. SHANK: Yeah.

MR. COBLEIGH: I spent a fair amount of time just trying to figure out which end was up on most of these.

MR. SHANK: Well, it's not always easy.

MR. COBLEIGH: If you would, there are a series of photographs, I don't think it's necessary to identify them individually but merely submit them as representative photographs of certain aspects of the tunnel project.

Q. So, if you would go over them with the arbitrator and indicate what we're showing.

A. Okay. I've had a very difficult time explaining this job site to just about anybody. It's a very intriguing place. This is looking towards the head. Again, the -- what you see at the front of the tunnel is a tunnel boring machine and that's about 300 yards long, about a hundred yards long, excuse me. It's made up of ten or eleven what they call gantry cars which are sections and it flows along. As it grinds, it takes all of the rock that it mines goes into a conveyor and gets dumped into rail cars and gets dragged out to the shaft and hauled up on conveyors and dumped out. So, you're following that machine all the way along.

This is looking -- this is along the side of the machine looking towards the front of the -- that's the tunnel boring machine at the very

front, that's the head that's cutting into the rock. This is also looking at the head. This is a walkway leading towards the head and this is an electrical conduit containing electrical wires. The machine itself is three levels high. There's a lower level, a middle level which is the access level, and an upper level. This carries the power up into the upper level.

This is on the lower level. That's a 13,200 volt transformer. That, again, is heading towards the front of the machine. That's just -- that again is just a view of the walkway leading to the front with the wires going over into the second level.

This is from the second level looking down at the base, the base level. That's a tunnel worker. He's digging out -- he's doing laborer's work. He's digging out -- cleaning out the muck, thickness, that gets dumped onto the floor.

That is -- at the very front of the machine, that is the cutting machine itself. That's what rotates. That's at the very front.

MR. MURPHY: This lighter part, that's part of the machine?

THE WITNESS: That's the machine. That's

the back of it.
A. Again, this is just an extended view of that, okay. This is the right-hand side of the machine. The right-hand gantry walkway running up towards the head of the machine.
This is about in the middle. These are explosion-proof devices, panels, breaker panels and everything, electrical equipment very similar to that. They control the equipment at various places on the machine. This is also right in the middle of the machine. It's the same thing.
This again, this electrical disconnects transformers and panels. This is where the -- this is looking at the lower section of the machine running along the outside of the machine. This is an example of the motors that turn the machine itself. That's a 350 horsepower motor.
MR. MURPHY: How big is that? How tall?
THE WITNESS: 350 horsepower.
MR. MURPHY: How tall is it, physically, 10 feet, 20 feet?
THE WITNESS: It's about half the width of this table, the length of the table.
MR. MURPHY: Okay.
A. That's all of these, Jerry, anything else?

Q. According to Union Exhibit 2, the TBM is 30 feet in diameter.
A. Isn't that what I said?
Q. I'm sure you did.
MR. MURPHY: Yeah, TBM 30 feet in diameter, 255 feet long and it weighs 590 tons (sic). It will go at 19 feet per hour.
A. Okay. This is at the head of the machine. I'd like to find that one. Okay. Off to the side here, the side of that picture at the head is the control panel for the operator. There's a machine situated and he controls how that -- again, to the best of my knowledge, he controls the operation of the machine from this panel. He's the -- he and this are the brains of the operation. These are the controls, these control all the motors and the hydraulic equipment basically from that point or the major control.
MR. COBLEIGH: We would offer those as combined Union 3.
MR. MURPHY: Any objection?
MR. SHANK: No, that's fine.
MR. COBLEIGH: Fourteen photographs submitted as combined Union 3. Union 1 was part of the first hearing. Should we start with --

let's change it because I've already numbered these things. If we don't change it, I've got it wrong. What if we call the pamphlet Union 1 for purposes of today's hearing. Union 2 would be the 14 photographs.

(Union Exhibits 1 and 2 marked for ID.)

Q. Pat, I'll show you a series of photographs and they're numbered on the back. So, if you would indicate the number and what it describes to the Arbitrator.

(Union Exhibit 3 marked for ID.)

A. Okay. Union Exhibit 3 shows a man walking by couple of electrical panels which are located roughly two-thirds of the way down from the head of the tunnel boring machine.

MR. MURPHY: Are you putting that in as a single exhibit?

MR. COBLEIGH: Yes.

MR. SHANK: Excuse me, but I'm confused now myself. You showed me two packages of photos.

MR. COBLEIGH: Right.

MR. SHANK: And the first package we're now calling Union 2, the series of fourteen photos?

MR. COBLEIGH: Right.

MR. SHANK: Now, Union 3, is that the second set of photos you showed me?

MR. COBLEIGH: No, it's one single photo.

MR. SHANK: That I haven't seen.

MR. COBLEIGH: Yes, it's one of those you saw.

MR. SHANK: You showed me two packages.

MR. COBLEIGH: Right. The second package, what I did was number them individually so that we could refer to them.

MR. SHANK: Yes, all right. Now, may I see what you're calling Union 3? Here's Union 3 and that's a man in a white shirt and a yellow hat walking past an electrical panel. Is that Union 3?

MR. COBLEIGH: Yes.

MR. SHANK: All right.

MR. COBLEIGH: We'll do these one at a time so you can see them.

MR. SHANK: And eventually you'll give me a copy of those?

MR. COBLEIGH: Yes.

MR. SHANK: Okay.

Q. What does Union 3 represent, sir?

A. Union 3, again, represents a worker walking by

one of the electrical panels located about two-thirds of the way down from the tunnel boring machine to the head.

Q. How many electrical panels are there on the machine?

A. This type here there are two, four, six, eight on that level. There's also, I think, four located below that.

MR. MURPHY: Say that again. How many of those panels?

THE WITNESS: There are eight located at this level and there are four located below this level.

Q. Would you identify Union 4.

(Union Exhibit 4 marked for ID.)

A. Union Exhibit 4 is a close-up of the front of the doors of one of these panels and the labeling located on those doors, it tells you the voltage contained inside is 480 volts. There's also a warning below that that says: Warning: Panel has multiple voltage supply sources. Then beneath that there's an identification label for that panel itself which is 3MCC. Directly below that in English and in Spanish is a warning sign that says: Danger, Electrical Equipment, Authorized

Personnel Only.
Q. Would you identify Union 5.
(Union Exhibit 5 marked for ID.)
A. Union 5 is, again, a look at the same panel backed off a little and also the panel sitting next to it, similar panel sitting next to it.
Q. I'm showing you Union 6 and Union 7, if you could identify those.
(Union Exhibits 6 and 7 marked for ID.)
A. Union Exhibit 6 shows the inside of one of these panels. It's a series of motor starters and contactors and terminal blocks. Union 7 is another panel. I'm not sure which one of these this is but they're all similar and it contains a series I would say of probably twelve or fifteen motor controls and terminal blocks and contactors.
Q. What is the voltage contained?
A. Please?
Q. What is the voltage cantained therein?
A. 480 volts. 3 Phase, 480 volts. Plus there's also 110 volt control circuits contained in each of these panels.
Q. I'm showing you Union's 8, 9 and 10 and again ask you to --
(Union Exhibits 8, 9 and 10 marked for

ID.)

A. Union 8, 9 and 10 are views of also the panels that I mentioned earlier, two-thirds of the way down on the machine towards the head. All three of them display -- when you open the doors, it shows what's inside which are motor starters of various sizes, various amperages and main disconnect and also terminal blocks containing wires with 480 volts. Also, there's control wiring in there of 110 volts.

MR. COBLEIGH: Union would offer the photographs identified as Union Exhibits 3 through 10.

MR. SHANK: No objection.

A. Would you think it proper for me to explain what a motor starter is and why they have the two voltages in it?

MR. COBLEIGH: You don't have to explain it to me as well and maybe not to the arbitrator but, sure.

MR. SHANK: Objection. Relevance.

MR. MURPHY: I don't know what the question is at this point.

MR. COBLEIGH: Well, the witness has identified the components of the electrical

cabinets. He is now explaining the function and the electrical involvement of those components.

MR. MURPHY: All right. And the immediate question?

MR. COBLEIGH: Start-up motors.

THE WITNESS: Yeah, the motor starters.

A. What you have -- again, especially with high voltage equipment, the higher -- the larger the size of the motor or the larger the equipment or the larger the voltage and the larger the horsepower and the larger the amperage translates also into physical size. So that a 350 horsepower motor, if you were to start that with a regular hand starter, you'd need basically three men and a boy to push it. It would be tremendously difficult to do. The way they get around that electrically or the way they address that problem is through control signals where you just have a push button to start or stop it.

What that does is, if you can picture this, a motor starter has your live voltage going which would be going to the top of the disconnect of the motor starter and your low voltage going up to the motor.

Q. Are you able to identify those functions?

A. Yeah, that would be this one right here.

MR. MURPHY: What's your exhibit number?

THE WITNESS: This is Exhibit Number 9. This is a breaker. It has the line voltage that's hot coming in the top. When that breaker is in the top position, that powers it through the bottom into this motor starter. What happens is there's a control circuit. So at this point this is hot and nothing else is hot.

There's a control circuit, a lower voltage, 480 volts, a lower voltage, 110 circuit, which is contained probably, in this case, probably up at the front of that machine at that panel that I showed you. This panel here, one of them in the earlier exhibits where there's a bunch of push buttons there to start and stop.

What this does is it pulls in a magnetic contactor in this motor starter which physically joins the line coming in and the load going out electrically, and that stays connected magnetically, electromagnetically, until somebody hits the stop button that releases that magnet and drops off the contact between the line coming in, the hot line, and the load going out the machine. So, there's no electrical contact there.

In other words, this allows you to use these little push buttons rather than --

MR. MURPHY: Like the starter on a car, I assume.

THE WITNESS: It's similar, you're right.

MR. MURPHY: Oversimplification but it beats getting out in front of the crank.

THE WITNESS: There you go.

Q. What other crafts work are on the job at the present time?

A. There are the electricians, there are the operating engineers and there is two specific international labor union locals. There's the 271, which is the Providence local, and 88 which is the tunnel workers from Boston, specifically tunnel workers from Boston.

Q. With the three crafts on the job, who has access to the panels that you've been describing?

A. Everybody.

Q. Okay. Do you know a Mr. Donald Umling?

A. Yes.

Q. Is he from the local area?

A. I believe he's from California.

Q. How do you know him?

A. He is an operating engineer. I think he --

well, he works for Shank/Balfour Beatty as an operating engineer.

MR. MURPHY: What's his name again?

THE WITNESS: Donald Umling.

Q. Okay. What functions does he perform on the job?

A. Well, I believe he's a supervisor for Shank/Balfour Beatty.

Q. Okay. Have you worked with him?

A. I've worked in the same general area with him since I started.

Q. And what functions have you seen him perform?

A. He does just about everything. Again, I've seen him -- I was under the assumption up until like from the very beginning that he was an operating engineer and since then I realized he's a supervisor for Shank/Balfour Beatty.

Q. Why do you identify him as a supervisor?

A. He was labeled that in a letter we received from Shank/Balfour Beatty.

Q. Have you seen him perform supervisory functions on the job?

A. Yeah, he directs the third shift crew basically.

Q. Did you have a conversation with Mr. Umling on August 24th of last year?

A. Yes, I did.

Q. What was the nature of that conversation?

A. Well, in June they started a third shift. The third shift included laborers and operating engineers. It didn't include electricians. On a number of occasions -- and we overlap -- our shift overlaps theirs. On a number of occasions the men on that shift told me that they were being instructed to go into the switch gear and throw breakers on and off most often without a lockout tag out.

MR. MURPHY: Is that the third shift, you say?

THE WITNESS: On that third shift, yes.

A. They didn't like doing it.

MR. SHANK: Objection. Hearsay. He's testifying about what somebody told him on another shift. Those people aren't here to be cross-examined. It should be given zero weight.

MR. COBLEIGH: With regard to the comment about whether or not the individuals liked it, we would agree. The testimony with regards to the facts which led to the witness's conversation with Mr. Umling would not be considered hearsay and they are not submitted for the truth of the

statement but merely as to the motivating factor for the witness's conversation.

MR. MURPHY: Of course, this being an arbitration proceeding, hearsay comes in subject to reduction in weight for the reasons you mentioned. You can't cross-examine and that's part of the mix. So your objection on that basis is overruled and if you remember the question, you can answer it.

THE WITNESS: I don't remember the question.

Q. You had a conversation with Mr. Umling and we're asking what the nature of that conversation is.

A. Right. Well, there was electrical work being done by people other than electricians. We were sure -- that's basically from two different directions -- one from talking with people involved on that shift. One time in particular we were called to work on a piece of equipment. They had asked us to shut it off, we shut off.

MR. MURPHY: Who is they?

THE WITNESS: That shift, Umling.

MR. MURPHY: The Umling person.

A. We shut it off. We were called into one of the other shafts to do work and when we came back,

somebody had gotten into the switch gear and turned it back on, got into this equipment here and turned it back on other than us. So there was work being done, you know, people were into the high voltage equipment doing work. I repeatedly mentioned to the people on that shift -- I didn't mention it to Umling specifically. I mentioned to all of them that they shouldn't be in our equipment.

Finally, I got ahold of all of them at once about sometime in July or towards the end of July. I waited for the -- because the workers themselves had been complaining about the fact that they had to go into switch gears and turn off the --

MR. SHANK: Objection.

MR. MURPHY: I'll wait for his objection.

MR. SHANK: This is so vague and confusing, I cannot follow it. Mr. Cobleigh asked Mr. Brady a question about an incident with Umling on August 24th. From that, Mr. Brady -- he's not answering questions, he's just simply taking off and wandering from subject to subject and making various claims. I can't understand what he's saying and I would appreciate it -- I think it's

customary even in arbitrations for witnesses to respond to questions. Not simply to get up there and ramble on and on about what happened on a different day, what happened in dealing with different people. It's incomprehensible to me.

MR. COBLEIGH: Maybe we can focus it.

Q. What happened on August 24th?

A. On the 24th I waited for the third shift to come down on the elevator. I wanted to talk to them all as a group so I wouldn't miss anybody. There were engineers, laborers and electricians there. There was also the laborers from -- they were at the bottom of the shaft when the elevator arrived.

I told them that I had been aware of the fact that or been made aware of the fact that electrical work -- that they were doing electrical work on that shift. I said this was wrong and that from a professional standpoint and also from a standpoint of safety, I said that it was very dangerous for them to be in that equipment, they're not trained in that equipment and I would appreciate it if they would let us do our work. I said, there is no electrician on that third shift but that doesn't mean that you people should be

doing the electrical work.

At that point Donald Umling came up to me and he said, look, I'm doing the electrical work. I've been doing the electrical work. I'm going to continue doing the electrical work. If there's an electrician around, I might get him to do it but if there's not, then I'm going to do it myself. He said, I don't care if that -- I'm going to use the word bothers -- he didn't use the word bothers.

Q. You can say whatever he said.

A. He said, I don't care if that pisses you off or your union off or your boss off. He said, that's the way it is. I said -- I was taken aback, you know. First of all, because it was very confrontational and second of all it was very unprofessional, in my opinion. I said, have you got a license? He said, I don't need a license. He said, I know more about electricity than you do. I said, that's not true. I said something to the fact that, you know, without a license, anybody is an electrician. He just -- that was the end of the conversation.

Q. Did you have any further interaction with Mr. Umling regarding his performance of electrical

work?

A. Yeah. Later, on an occasion in February.

MR. MURPHY: After the August incident?

THE WITNESS: Yeah, after the August incident.

A. Again, when that happened in August, I contacted my business agent about it and we were under the impression that we were dealing with -- they tried to straighten it out anyway and whatever -- I don't know what came down on that. But the following February, my partner and I were running a cable across the top of the machine, along the surface of the tunnel wall on the top. We were working up on a ladder -- it was very confined space -- and somehow or other as it turned out a breaker on the gas detection system was shut off, which in turn shut off the control system, it shut off the machine.

Now, the control system is made up of a series of panic switches or emergency stops. They're designed to protect people. If somebody gets hung up on the machine, you can hit one of these buttons and it will shut down the equipment. There also a rope that runs the length of the machine. If you pull that rope, it will

accomplish the same thing, it will shut down the equipment. There is also tide into that a couple of little more sophisticated systems, like the gas detection system. That, again, if it picks up an alarm, it will shut it off.

So, we were unaware evidently that day there that on the way down the ladder we kicked off the gas detection breaker. So, we were unaware of it and one of the mechanics or one of the laborers came down and said, hey, the emergency system is down. So, when that happens, usually it's an inadvertent activation of either closing one of the stop buttons which shuts it down or else pulls on the rope. So we checked all of that. We had the people that were working there check all the stop stations, make sure they weren't pulled out. So, they weren't. So that meant we had to track it down. We had to go below the level we were working and open the panels of one of these electrical panels that I've shown you on the lower level. On the door of that panel was all of the terminal blocks containing the emergency system circuit.

As we were tracking that out, again, as you open the door to this, the inside is very

similar to this. It's all 480 volt equipment.

MR. MURPHY: Is that a numbered exhibit?

THE WITNESS: Yes, this is Exhibit 9.

A. That's the inside of the panel. The panel downstairs was very similar to that but on the door swinging out contained all the control circuits for the emergency circuits. So, we were in electrical terms we were ringing it up. We were following it from the start down to where we could determine where it was broken so we could address it. While we were down there, we heard these contactors pulling in from the panel next to us, which would indicate -- we couldn't figure it out, I mean, why that was happening.

What was happening was, Donald Umling was up above throwing breakers -- randomly throwing breakers trying to get this thing started while we were downstairs electrically trying to figure out what was wrong. All of a sudden he threw the breaker for the gas detection system, which we had knocked off, inadvertently knocked off, and this whole panel kicked in. All these contactors kicked in, you know. If one of us had been -- and we couldn't shut -- this was a situation where you couldn't lock it out because you were trying to

figure out what was wrong with it. If one of us had been in that panel, they would have gotten electrocuted.

At that time the guy I was working with, Bob Powers, said, you know, this is crazy. He said, I'm going to talk to him. He went upstairs -- when we got everything squared away, we went upstairs to the front of the machine where Umling was working and he said, hey, what are you doing, we're working? What are you throwing breakers for, we're down in that panel trying to troubleshoot. He said, don't bother me. He said, what? He says, don't bother me. He says, if we had to wait for you, we would have been here all night. At that time I got into a discussion with him and it got kind of hot and I ended up walking away. The next day I contacted my business agent and that has led to a letter coming back from Mr. Shank saying that it was basically no big deal. But he also in that letter labeled Donald Umling as his supervisor.

MR. COBLEIGH: No other questions.

MR. MURPHY: Mr. Shank, do you want to go ahead now or do you need a minute to collect your notes?

MR. SHANK: No, I just have a few questions.

MR. MURPHY: Okay.

EXAMINATION BY MR. SHANK:

Q. Mr. Brady, you testified that you work on the swing shift?

A. Yes.

Q. And what time do you come to work?

A. 5:00.

Q. 5:00. And ordinarily, what time do you get off work?

A. I'm scheduled to get over at 1:00. Very rarely does that happen.

Q. And you testified that many days you worked fourteen and fifteen hours?

A. Right.

Q. And why do you work those extra hours?

A. I don't understand the question.

Q. Well, if your shift is scheduled to get off at 1:00, why do you work sometimes until 3:00, 4:00 or 5:00 in the morning?

A. For different reasons. Again, as I stated before, they have -- they have a process, as you know, they drill head of the machine to see if they detect water, in which case they have to pump

grout in so they can mine it. If that happens, we have to set up the drill machine and we have to set up -- if they find water, we have to set up the grouting machine. That usually runs into a double shift. That is to the extent of -- on that day, if they're doing that, you know you're going to be working those hours. Other than that, I would say that it's a toss of the coin as to whether you're going to work eight hours or anything up to and including fourteen hours, depending on what they have scheduled.

Q. Well, in other words, you're kept around to do electrical work that might occur after you normally get off?

A. After my shift normally ends, yes.

Q. After your shift would normally get off. Now, what hours does the mining machine work, the tunnel boring machine?

A. That works from, I believe 6:30 to 6:30.

Q. And on that shift, I believe you testified that there were -- when the mining machine was actually working, there were four electricians on the job, two in the tunnel and two on the surface; is that correct?

A. Right.

Q. So, all of those pictures you showed of the panels and the motors and that, when the machine is running, there are four electricians available on day shift and you coming on on swing shift to take care of any electrical work that might come up; isn't that true?

A. To take care of electrical work that might come up?

Q. Yes. In other words, you described all of the electrical equipment on the tunnel boring machine?

A. Right.

Q. You said these were the motors, these were the electrical panels?

A. Right.

Q. And my question is that when those things are operating, those motors, those panels, and all of that, on the day shift there are four electricians available, two in the tunnel to take care of those things; is that true?

A. Right.

Q. And you come on on the second shift and you would be there if the machine worked till 6:30 or so, if the machine still happened to be working, you and your partner would come on and you would be there until that mining machine stopped running,

wouldn't you?
A. I don't understand.
Q. What I'm trying to drive at -- maybe I can simplify my question. What I'm trying to say is, whenever that mining machine is running, it's being tended to by four electricians on day shift, and if it happens to be running when you come on on swing shift, you will be there with your partner also to take care of it; isn't that true?
A. I suppose so, yes.
Q. All right.
A. But the four electricians, the two on the surface maintaining the machine, they're up on the surface and they could be at the other -- at the end of --
Q. They could be, yes, but aren't they called into the tunnel on occasion?
A. Yes.
Q. And if electrical work needs to be done on graveyard shift or at some time perhaps after you've gone home, isn't it true that electricians are called out to do that kind of work?
A. Well, one time that they called them out was very recently. Last Thursday our shift ended at 2:00 that day and I think at 4:00, somebody

other than an electrician was up rearranging one of the 480 volt lights in the shaft and it filled up with water and it shut down the entire -- it shorted-out two of the 480 phases and shut down the electrical power right out of the street and shut the job down. That's when they called in the electrician to straighten it out.

Q. Well, my question is, doesn't the company make a practice of calling out electricians at all odd hours, including weekends, if there's an electrical problem to be taken care of?

A. Well, if the electrical problem to be taken care of, again, in that instance, was the electrical work being done by people who weren't electricians.

Q. Sir, that's not my question. You're the job steward. You should know whether or not people are called out on odd hours and on weekends to take care of electrical problems. That's the only question I'm asking you.

A. Yes, they are called in.

Q. All right. Now, we get back to the question of motor starters. You made it a point of describing how motor starters work and how there's two sets of voltages, controlled voltage and all of that,

but the bottom line in all of that is that what's presented to the workers on the job is one button to push to start a motor; isn't that true?

A. I don't know.

Q. You don't know, you testified that what happens is there's a starter button.

A. But I don't present that to the workers. I'm an electrician. I don't tell them how to --

Q. Excuse me, my question wasn't very well put. The other workers on the job, if they want to start an electrical motor, they don't have to know what's inside the panel, do they?

A. They should.

Q. Why should they?

A. If they're going in there, they should know what the hazards are.

Q. That's not the question. My question is, to start a motor, any craft can push a button and the motor will start, isn't that true?

A. Sure.

Q. And they don't have to know what's inside that panel?

A. I disagree. Because you've got to know what not to hit. I mean, if you look at the array of electrical equipment in there, there's a lot of

exposed parts in there. If you don't know electricity, you're at risk. That's my issue.

Q. Well, that's your issue but that isn't my question. My question, isn't it perfectly safe for the TBM operator to push a button at the front of the machine to start an electric motor to power the TBM?

A. Of course.

Q. All right. And do you contend that he shouldn't be able to do that, that that's an electrician's work?

A. Absolutely not at all.

Q. All right. Now, let's get back to this incident of August 24th. If I remember correctly, on August 24th you had a confrontation with Donald Umling, I believe?

A. I don't think so. I had what I explained. I had a conversation with the group of workers coming down on the third shift. It turned confrontational when Donald Umling said what he said. If it was confrontational, I mean, I don't know how you define confrontations, that wasn't my idea of a confrontation. I mean, he said what he said and I basically backed off.

Q. Well, that's good, you did the right thing. But

at that time you felt there was an issue about him doing electrical work?
A. Yes.
Q. Did that --
A. Excuse me, I had an issue with not only him doing the electrical work but him directing those under him to do electrical work.
Q. And did that particular issue result in a grievance being filed?
A. I'm not -- I believe it was handled outside of the grievance process. I'm not really sure.
Q. You don't know?
A. No.
Q. All right. Now, on February 3rd another incident occurred with Donald Umling?
A. That's right.
Q. The one you've described?
A. Yes.
Q. And that incident did result in a grievance being filed?
A. Indirectly, indirectly.
Q. Well, I'm not sure what you mean by indirectly but on February 14th a grievance was filed and that grievance is the subject of this hearing.
A. Right.

Q. Is that true?
A. Right but, again, that's directly true. What happened was prior to the incident of February 3rd, is that the date you're talking about, February 3rd?
Q. Yes, but I didn't ask you to describe that. I just asked you if you knew whether or not the incident of February 3rd resulted in a grievance being filed?
A. I don't know.
Q. You don't know?
A. Not this grievance. It was involved in it but I mean --
Q. Well, if you don't know, I don't want you to answer.
A. Okay.
Q. You referred then to a letter that I wrote to Mr. Durand. Do you recall that letter?
A. Yes.
Q. And in that letter you said that I called Mr. Umling a supervisor?
A. Yes.
Q. Other than what you read in my letter, do you have any idea what constitutes a supervisor?
A. You mean, the dictionary definition?

Q. No. A definition under labor law.
A. A supervisor is a supervisor.
Q. Well, in other words, you can't describe under labor law what a supervisor means?
A. Okay. No, I can't. I know what it means by dictionary.
Q. Please, there's no question pending. I take it from your testimony that except for the incident on February 3rd, with your own eyes, you've never seen Donald Umling or any other person or any other craft actually opening cabinets and physically working on electrical equipment?
A. Except for the time that our shifts overlap, I'm not there. So, I wouldn't -- and we could be at any other place along the tunnel in the auxiliary shaft. So, no, I haven't.
MR. SHANK: I have no further questions.
MR. MURPHY: Redirect?
MR. COBLEIGH: Yes.
EXAMINATION BY MR. COBLEIGH:
Q. Pat, was it your earlier testimony that Mr. Umling directed the work force on the third shirt?
A. Yes.
MR. COBLEIGH: Nothing else.
MR. SHANK: Nothing more.

MR. COBLEIGH: May have a moment?
MR. MURPHY: Yes, sir.
(A short recess was taken.)
MR. MURPHY: Okay. Mr. Cobleigh?

WOLFGANG FRANZBLAU,

having first been duly sworn by the Arbitrator, testified as follows:

EXAMINATION BY MR. COBLEIGH:

Q. If you would also start out by telling the arbitrator what your background and training and experience are.
A. As far as training, I've completed the apprenticeship program through the operating engineers. I've been in the Union for seven and half years.
MR. MURPHY: Keep your voice up, please.
A. I started as an apprentice in the Union. I went through that training program. I've got a full hoisting license, powerline safety, OSHA ten-hour, Amtrack safety course. I've got a ton of licenses and things like that. I am qualified to work on just about any construction job. I don't have the degrees as Mr. Brady does but as far as my line of work, I am qualified but that's the licenses that I do have.

Q. Which Union do you belong to?
A. Local 57, Operating Engineers.
Q. By whom are you currently employed?
A. Shank/Balfour Beatty.
Q. Where are you working now?
A. I'm at the Foundry site. I run a crane.
Q. How long have you done that?
A. I've been on this portion of the job for about a month.
Q. Where did you work previously?
A. I was at Shank/Balfour Beatty for almost two years.
Q. Where was that?
A. That was at the main site off of Terminal Road.
Q. Working in the tunnel?
A. I worked all three shifts. I helped build the boring machine, the gantry cars. After that I went to the second shift in the garage and from there I went to third shift where I worked with Don Umling down at the cutter head.
Q. What was the nature of the work performed on that third shift?
A. Maintenance and repair. The machine inherently is self-destructive and requires

constant attention so they mine it during the day and during the evening we fixed it.

Q. What does fixing the machine mean?

A. Anywhere from replacing worn-out cutters on the face of the cutter head. Welding warn-out wearplates, replacing hydraulic motors that had developed leaks or failed to do their job. Anything that needed attention so that the following day the men charged with running the mining machine and gaining footage could do their job without being slowed down by components that weren't repaired. They didn't have to worry about components that weren't repaired, they could come in and do their job.

Q. Who was in charge of the third shift when you worked there?

A. That was Don Umling.

Q. Well, while you were working on the third shift, were there any electricians employed on that shift?

A. Not where I was. I didn't see any electricians that were stationed with us.

Q. Were there occasions on the third shift when electrical problems developed?

A. Yes, there were.

Q. How were those handled?
A. Most of the time they were minor problems and when they were, Don would usually tackle them. If they were beyond something he could do, then at that point he would call an electrician.
Q. Okay. Did you have occasion while you were on the third shift to discuss with Mr. Umling the responsibilities with regards to electrical work?
A. No, he knows that -- he knows my standpoint is that I'm an operating engineer and that it just wasn't open for discussion. It's not something that you volunteered to talk about.
Q. Did he ask you at any time to perform electrical work?
A. Sure. Now and then as you're replacing cutters, you have to turn the cutter head so that the one you're working in would be in the 12 o'clock position so you can work. Relatively easier than say if the cutter was down in a 5:00 position. Sometimes when you would go to turn the head, it would pop a circuit breaker within one of those panels that Mr. Brady showed in the pictures. It would be necessary to go and open one of the panels to access a particular breaker and flip it back so you could turn the cutter head

and sometimes you would go to turn it and it would pop the breaker again and somebody would have to go back there and throw this breaker until we could turn the head.
Q. And who would perform that function?
A. It was Don. I'm not sure if he had the other guys do it. He showed me the breaker once and I told him I wasn't going to be throwing the breaker. I'm not going into the panels.
Q. Why did you take that position?
A. Because I don't know what's going on inside there. I know what a circuit breaker is and how it works. I know I'm not going to get electrocuted throwing it but if you look in the stuff inside there, I don't go reaching into that stuff.
Q. Let me show you Union Exhibits 4 and 5. Do you recognize what's been identified in Union Exhibits 4 and 5?
A. Yes, I do.
Q. What do they represent?
A. Those are the electrical panels and those are the warning labels.
Q. Are you familiar with the signs in the panels that indicate that only authorized personnel are

allowed in there?
A. Yeah.
Q. What was your understanding of that?
A. Those labels told me they're not my area of expertise. I don't deal with electrical problems.
Q. When you worked the first and second shift, who worked in these panels?
A. When I was on the first and second shift, I was up top and those are down trailing -- those are part of the gear that trail the tunnel boring machine.
Q. There's been testimony with regard to electricians being called in who were not otherwise on duty to deal with specific situations. Do you have any familiarity with that?
A. My experience has been that the electricians will be called if there's something that can't be taken care of, if they can't get around calling an electrician. It's not like an electrical problem arises and the first reaction is to call an electrician.
Q. Other than the matters involving the electrical work on the TBM, did you have occasion to observe Mr. Umling attempting to deal with other electrical problems?

A. If an electrical problem arose, he would leave us at the head. He would tell us he was going to take care of it and usually he would. If he couldn't, then an electrician would be called.
Q. Did you have any personal experience around Christmastime, any problem with electrical work?
A. There was a length of -- I don't know what you'd call it -- it's pipe tape. It's electrical. You wrap it around a hose or a pipe when it's cold out to keep the hose or pipe from freezing and it was shorting out. It was dropping sparks and you could smell -- an electrical fire has a distinctive smell and it smelled -- you could tell it was electrical.
Every now and then it could spark and most of the time it was smoking and the only supervisor on duty was Don and he was called up from the head and we told him, there's an electrical fire up there. He grabbed the hose and started squirting it down with the hose. I didn't feel that to be the best judgment I'd ever seen.
Q. What was your reaction?
A. I took off. I told him that was electrical and it's probably not a good idea to use the hose. He said, I'll take care of it. So I turned around

and I walked to the -- we're standing on something called a switch at the bottom of the Shaft 1. I went as fast as I could to the other end of the switch anticipating the worst, nothing happened as a result of it, but common sense would dictate that water isn't the best relief for an electrical fire.

MR. COBLEIGH: No other questions.

MR. MURPHY: Mr. Shank?

EXAMINATION BY MR. SHANK:

Q. You worked on the third shift with Donald Umling how long?

A. I don't know exactly, probably better than six months.

Q. And the electrical work that you saw him doing consisted of resetting breakers it sounds like to me from your testimony?

A. My eyewitness, yes.

Q. And did you ever open a cabinet yourself to see what those breakers looked like?

A. No.

Q. So you have no idea what he was doing in that cabinet, physically?

A. There was one time he took me with him to show me which breaker he was throwing in anticipation

that I would behave the same way. So I know from seeing those panels when they were being built and from seeing them when electricians had them open, I could see what's in there but I couldn't identify everything in them.

Q. But when you would open the door to a panel where breakers were, you would see breakers; isn't that true? Isn't that what you saw?

A. If I would open the door, but I never opened the door to those panels.

Q. But you did open the door at least once because Umling took you back -- you testified that Umling took you back and showed you what it looked like inside of a panel so that you could do that?

A. Don opened the door, not me.

Q. All right, but when you opened the door, you saw some breakers to push, is that correct? To push or to --

A. I believe there were to push.

Q. All right. And the incident you described relative to the burning cable didn't happen at the TBM, it happened out at the bottom of the shaft?

A. That's correct.

Q. And did you feel that an electrician should have put that power on?

A. Personally, yes. I could be wrong but that is how I feel. I feel an electrician should have addressed that problem.

Q. Well, have you ever seen Shank/Balfour Beatty's plan for dealing with fires?

A. No.

Q. That subject has never come up in any of your safety training or anything like that?

A. At the safety meetings, I'm sure it's been covered. I couldn't recall the exact dates but I'm sure it was discussed about how to address fires and water not being a good relief for an electrical fire. It had to have been touched. They go through the ABC designation on fire extinguishers at each of these.

Q. But, I think -- would you agree from your training that the most important thing in fighting a fire is to get it stopped?

A. Absolutely.

Q. Yes. So that perhaps it would be more prudent to have anybody try to stop it than calling for an electrician who wasn't there, would you agree with that?

A. I think on one hand it's definitely important to get the fire out. On the other hand, being a

known electrical fire and where it was, it was midway -- well, it was not midway but it was clearly above our heads and not in danger of igniting anything else like a fuel source or gas or anything. I don't think that squirting it with a hose was a wise choice at all.

MR. SHANK: No further questions.

MR. COBLEIGH: No redirect.

MR. MURPHY: Thank you, sir.

MR. COBLEIGH: Subject to rebuttal, Union rests.

MR. MURPHY: Do I have a copy of the grievance?

MR. COBLEIGH: You do.

MR. MURPHY: Mr. Shank, what's your pleasure?

MR. SHANK: Well, my pleasure first is to return to the first hearing. I reviewed that hearing record and I think it's perfectly clear that we've protested your decision to hear what amounts to a jurisdictional dispute and we contend that's beyond your powers. That's in the hearing record.

Second, we believe that the agreement doesn't give you the authority to decide your own

jurisdiction in a case like this. That's substantive arbitrability so we preserve that right to carry the matter further under either Rhode Island or federal law. We haven't waived that right by participating either in the first hearing or in this hearing.

We know that this is a jurisdictional dispute notwithstanding your agreement with Mr. Cobleigh that it wasn't. That's beyond your power to hear. Actually, in the first hearing, I made enough statements to clarify that not only was this a jurisdictional dispute but it had already been heard and it had already been decided. But, at that time, I had nothing more than my testimony which as Shank/Balfour Beatty's counsel, I'm not sure exactly what that amounts to.

At this time, I want to get back into that subject and I have some evidence here that this is a jurisdictional dispute that was long since decided and the Union is now trying to reopen the same thing under Section 11 of the Collective Bargaining Agreement, the grievance procedure.

At the first hearing -- although I mentioned Section 7 in jurisdiction and testified about it, it didn't go anywhere. Section 7 just

seemed to disappear from the issues. So, at this time I have some evidence to offer about that and also I want to testify. So I want to be sworn as a witness.

MR. MURPHY: Yes, sir.

MICHAEL L. SHANK,

having first been duly sworn by the Arbitrator Public, testified as follows:

MR. COBLEIGH: This may be premature but if the subject of Mr. Shank's testimony is going to be directed towards the issue of arbitrability, we have an objection. That issue has been heard and ruled upon by the arbitrator. This hearing is on the merits of the case.

MR. MURPHY: Mr. Shank, you're not a witness. You're now an advocate.

MR. SHANK: Well, I can be both.

MR. MURPHY: Yeah. We have to know which one.

MR. SHANK: Well, at this point I want to be a witness.

MR. MURPHY: Well, Mr. Cobleigh has objected to -- you're testifying as to the arbitrability question on the grounds that it's been decided.

MR. SHANK: No, I'm testifying now as to what's electrical work and jurisdiction.

MR. MURPHY: Well, since you haven't opened your mouth yet, you haven't said anything about electrical work, but I think Mr. Cobleigh's objection is well taken that the question of arbitrability has been decided. Now, I don't know how -- what do you propose to testify about?

MR. SHANK: Well, I'm going to testify about what is and what isn't electrical work. The whole substance of the Union's case is that other people are doing electrical work.

MR. COBLEIGH: No objection to that.

MR. MURPHY: Okay.

MR. SHANK: In fact, I was going to quote from the hearing record where Mr. Cobleigh said that was the whole issue you were going to decide, what was electrical work.

MR. MURPHY: All right. Why don't you go ahead.

MR. SHANK: Now, I realize it's awkward that I'm a counsel and a percipient witness but that's fairly commonplace, I think, in these proceedings. I've done that many times.

MR. COBLEIGH: No objection to it.

MR. MURPHY: I have no difficulty with it.

MR. SHANK: And we contend this is a jurisdictional matter and we think it's clear from reading Section 7 of the Collective Bargaining Agreement, which I negotiated with the three trades. Section 7 begins with a statement that Shank/Balfour Beatty will make work assignments. And you will see in the Collective Bargaining Agreement that Shank/Balfour Beatty assigned electrical work to the electricians.

A long time ago early in March or actually early in 2004 the issue arose of what was electrical work. Mr. Durand called a meeting with the building trades. The meeting was chaired by Mr. Ronny Coia who at that time was president of the building trades. The other crafts were present, the operating engineers and the laborers. The issue arose of what electrical work was. At that meeting I said we're not contesting that the electricians should do electrical work. However, what we're saying is that what the electricians are claiming is electrical work is not electrical work.

At that meeting I explained the kind of things that we didn't consider to be electrical

work, work that did not require the skill of the electrician, that any craft could do it and that's how it had been historically done in tunnels. At that meeting the other crafts agreed with me.

MR. COBLEIGH: Objection.

MR. MURPHY: Grounds?

MR. COBLEIGH: I think if we're going to have testimony on the critical issue in this proceeding, hearsay is inappropriate. If allowed under the generous standards of arbitration, it should be given very little weight.

MR. MURPHY: I think you pretty well stated what I would have said. The attitude of arbitrators toward hearsay as it comes in is "for what it's worth."

MR. SHANK: Yes, I understand that.

MR. MURPHY: Okay.

MR. SHANK: I understand that. A reading of Section 7 makes it plain, that if a jurisdictional dispute arises, which it did in this case, and the dispute was over what was electrical work and what wasn't, the way that dispute would be handled is the Unions would get together and agree among themselves to a solution. But, if the Unions could not agree, the company's

original assignment stood.

At this particular meeting, I explained what was and what wasn't electrical work. Mr. Durand disagreed with me but the other crafts agreed with me. They said, you are right, what the electricians are claiming is electrical work is not electrical work. And I listed a number of things such as pushing buttons to start motors, resetting breakers, plugging in electrical cords, unplugging electrical cords, dismounting electrical motors from the equipment once the electricians had turned the power on and off. It was perfectly clear to the other crafts what they were talking about and what I was talking about and what the electricians were claiming.

Now, back to -- so my opinion is that jurisdictional dispute was settled right there. All of these things that Mr. Durand or the IBEW has brought up later as electrical work is not electrical work in accordance with the Collective Bargaining Agreement and has already been decided by a jurisdictional proceeding. So, we're back to the position that the electricians are trying to reopen a jurisdictional issue that they lost now under the grievance procedure.

Now, I'm going to offer as evidence a letter I wrote to both the electricians and the -- I'm sorry, both the laborers and the operating engineers on May 25th. This letter recounts exactly what went on at that meeting, this particular meeting. I ask the operating engineers and the laborers to read the letter and to confirm whether or not what I'd said in there was true. And you will see attached thereto the response that I received from the operating engineers and the laborers.

This would be Company 1.

MR. COBLEIGH: Objection.

MR. MURPHY: On the grounds?

MR. COBLEIGH: Two reasons. We are back in what is arbitrability. The question here is not whether the laborers or the operating engineers are claiming this as their work, they are not. If one of their workers were doing this, this would be a jurisdictional dispute. The fact that Mr. Umling is doing it, it changes the nature of this proceeding from what the company would like it to be in a jurisdictional dispute to what it actually is. A question of supervisors doing bargaining unit work.

So whether or not there has been previous discussion has nothing to do with either the interpretation of the contract or the merits of the case. It deals strictly with the arbitrability issue which you've already ruled on.

MR. MURPHY: Mr. Shank?

MR. SHANK: Well, at the previous hearing Mr. Cobleigh took the position that you were going to be deciding what was or was not electrical work and I think that's what he's asking you to do. This is relevant evidence, of course. And as to the idea of whether Mr. Umling is a supervisor or an operating engineer, I haven't got to that point yet.

MR. MURPHY: The best I can do is express the opinion that frankly it appears to be a mixed bag. There are nuances arising out of the arbitrability question and this discussion between or amongst the various other locals and the company, which have been decided, that they would raise the arbitrability question and that's been decided. But to the extent that somebody else says that this work is not electrical, is not exclusively electricians', I think that's relevant, again, for what it's worth, to come in

and to be considered as part on the merits.

So I'll overrule your observation, Mr. Cobleigh, and mark this as Company 1.

(Company Exhibit 1 marked for ID.)

MR. MURPHY: Do you want to continue, Mr. Shank?

MR. SHANK: Yes. Somehow the Union seems to believe their case hinges on whether or not Donald Umling is a supervisor. We certainly question that. Section 2 (3) of the National Labor Relations Act says that supervisors are excluded from coverage under the accounts. Section 2 (11) of the same Act defines supervisors and supervisors are people who have the authority using their own independent judgment to hire and to fire and all of that.

But what that's relevant to is whether or not supervisors are covered by the Act. But Section 2 (14) of the Act also permits employers and unions to have supervisors covered by a Collective Bargaining Agreement. In this case you will see that the Collective Bargaining Agreement includes foremen as being covered under the agreement.

It's covered in two places, one under the

section speaking about who's excluded from coverage under the Bargaining Agreement and superintendents and managers are not covered but under another section all foremen are covered and Donald Umling is a mechanic foreman. He is a member of the operating engineers and I want to offer this Shank/Balfour Beatty Monthly Contribution Report to the Operating Engineers Trust Funds as C2.

This is a document that Shank/Balfour Beatty prepares in the ordinary course of doing its business. It's filed every month with the trust funds for the operating engineers. If you'll turn to the second page of that, you will see down about four lines under the craft mechanic foreman, Donald J. Umling. Donald J. Umling is an operating engineer. He's a mechanic foreman. He may be a supervisor, that's arguable, but he's covered by the Collective Bargaining Agreement and as such he's an operating engineer.

So, it's mistaken to somehow call him a supervisor on the one hand but not to recognize that he's an operating engineer on the other hand for purpose of the Collective Bargaining Agreement and jurisdiction. So, when he's doing electrical

work, so-called electrical work, he's doing that work as an operating engineer, not as a supervisor.

MR. COBLEIGH: No objection to the exhibit.

MR. MURPHY: I'm still looking for Umling.

MR. SHANK: Oh, he'll be down on the first, second, third, fourth line you'll see craft mechanic foreman and the next name will be Umling, Donald J.

MR. MURPHY: I've got him. Company 2.

(Company Exhibit 2 marked for ID.)

MR. MURPHY: Do you have more to present?

MR. SHANK: I'm thinking. Is it lunchtime?

MR. BRADY: It's a quarter to 12:00.

MR. SHANK: You know, I need a few minutes to think about this. May I have a short break to step outside and consult with my witnesses?

MR. MURPHY: Whoever you find out there. Sure. Short recess.

(A short recess was taken.)

MR. MURPHY: All right. After your conference with your head of litigation.

MR. SHANK: We rest.

MR. MURPHY: Mr. Cobleigh?
MR. COBLEIGH: I had several questions.

EXAMINATION BY MR. COBLEIGH:

Q. Mr. Shank, the letter that was introduced as Company Exhibit 1, was a copy of that sent to Mr. Durand?
A. No.
Q. Why not?
A. I didn't think there was any reason to.
Q. You understood his position to be that some of the items listed in that correspondence were within the jurisdiction of Local 99; is that correct?
A. I understood that because he made that clear at the meeting of March 17th, 2004, that I referred to in the letter.
Q. Okay. But you didn't think it was necessary to send the letter outlining what happened at the meeting to him?
A. I didn't think it was necessary, no.
Q. Okay. Were there items in that letter, items such as plugging and unplugging of electrical cords, that Local 99 was claiming as their work?
A. At one time they were, yes.
Q. Okay. And did that change?
A. Well, after the March 17th, 2004 meeting,

which in my opinion settled the matter when the other crafts disagreed with Mr. Durand's position, we didn't hear much more about the issue at all for some time. And then the matter blew up again, I think probably about the time Mr. Brady came on the job, maybe it was before that, I'm not sure. But, again, the same issues were reopened that had been brought up at that meeting.

Q. Let me ask you this, plugging and unplugging electrical cords, do you have warning signs on electrical cords that say, these are only to be plugged or unplugged by authorized personnel?

A. Well, I doubt that because there's several kinds of cords. There's 110 volt or 220 volt cords which might be the kind that run skill saws, things of that nature. We have 480 volt cords that are plugged. Our 13,200 cables are spliced. So, I can't answer whether or not there's --

Q. Well, of the items that you mention in your letter of May 25th, which of them have warning signs on them?

A. Well, let me refer to the letter then. Plugging and unplugging of electrical cords for pumps, lights, hand-held tools, and the like. I doubt if those -- they could have warnings on them

one way or the other, I don't know. The warnings might have something to do with -- but I don't recall seeing warning signs on those. Pushing start-stop and breaker reset buttons for pumps, fans, hand-held tools, TBM operating functions and the like, in some cases you would have the -- if a breaker happened to be inside of an electrical cabinet, there could be a warning sign on that.

I do point out that when we're talking about resetting breakers, we're merely talking about, in some cases, flipping up a top on a box and pushing a button or in the case of opening an electrical panel and pushing a breaker where a TBM motor may have been stopped. There's no hazard on that. There's no live wires exposed on that. When you open the cabinet, you see a breaker in front of you and you throw the breaker. It's our opinion that doesn't require the skill of the electrician and it's also that same opinion of the other crafts.

Q. Why do you put these signs on that say: Danger, Electrical Equipment, Authorized Personnel Only?

A. It's required by OSHA.

Q. And why do you think that's required?

A. Well, the implication is that if you have to

go past the front of the panel, past actually pushing a button, then that work gets into the skill of the electrician and nobody else should be doing it.

Q. Well, there's signs on the outside of the panel; isn't there?

A. Yes.

Q. What about 480 volts? Do you consider that to be a voltage that should be handled by individuals with some experience with electricity?

A. Well, certainly if they're dealing with live and exposed wires but where the TBM operator presses a button to start a 480 volt motor, where a mechanic presses a button to reset a breaker, as Mr. Brady testified, it's just like pushing a button to start a car. The mechanic does not have to know how it works. He's not in contact with 480. All he's doing is resetting the breaker.

Q. All right. And Mr. Brady also testified that the Union had no problem with people pushing buttons to start motors, didn't he?

A. He did say that and --

Q. Who are the authorized personnel that the OSHA label requires?

A. Our position has always been, and it is today,

that if you have to go beyond pushing a button or plugging in a cord, resetting the breaker, doing something like that, if you have to unscrew a panel and go behind that button and actually see wires exposed as in some of your exhibits, only an electrician can work on that and only an electrician does work on that.

Q. Now, you heard Mr. Brady's testimony that he and his partner were working trying to find the source of a problem and Mr. Umling was in one of the panels throwing switches on and off, trying to figure out what might start the machine up again. Do you recall that?

A. I do recall that.

Q. Do you regard that as a safe practice?

A. No, I didn't regard that as a safe practice, certainly I didn't, and I think in my letter -- well, the unsafe practice occurred because -- not because he pushed or didn't push a button, he used bad judgment pushing a button before he knew somebody else was working on some other part of the system. I think I made that clear in my letter. That resulted in a confrontation there in the tunnel and in essence we apologize for that. Said that we would tell Mr. Umling not to do that

ever again. That his job was to work in cooperation with electricians. That's our company policy.

Q. Okay. Based on your testimony that either the laborers or the operating engineers have the ability to perform the functions that Mr. Umling is performing, is it accurate that you would say anyone on that job has the right to go into any of these electrical cabinets and throw whatever switches they deem appropriate?

A. Absolutely. Exercising judgment, of course. We don't say that anybody can do it but somebody who's regularly engaged in working on the machine and needs to, for example, Mr. Franzblau's description on the third shift, they have to turn the wheel on the TBM to change cutters. Well somebody has to push the button to start the TBM. Somebody has to turn it to a certain point. Somebody has to plug in an electrical cord to move it up forward to get light inside the head. In the process if a breaker trips, somebody has to go back and reset that breaker. That's work that we say can be done by anybody other than an electrician. And that's the decision that was made at the March 17th, 2004 meeting.

Q. Okay. I just want to be clear on that. Any laborer and any operating engineer on the job can open up one of these cabinets, go in and throw whatever switch they deem is appropriate?

A. Obviously, I don't agree with your characterization of that, not at all. What I'm saying is, let's just take on the third shift, the example is Donald Umling. He knows what panel he needs to open and he knows what breaker he needs to reset, as evidenced by the fact that he was going to explain to Mr. Franzblau how to do it. He knows what has to be done. That doesn't authorize just anybody willy-nilly to be going around and opening up these panels, of course not, that's not our policy and that isn't what happens.

Q. That's why we are trying to define who authorized personnel are.

A. Well, the people who are working right there with it and it's something we do on all the shifts, by the way. The subject comes up on all the shifts and it comes up in connection not just with the TBM but on other parts of the job. We're working at many places on the job.

Q. With regard to Mr. Franzblau's testimony, he said Mr. Umling was about to show him how to do this

and he indicated he didn't believe that was operating engineer work. Do you recall that?
A. Yes, that was his opinion and I am sure that it's not our practice to try to force people to do things they don't want to do. The subject comes up all the time. It's part of prudent management. If Mr. Franzblau didn't want to do it, we're not going to fire him because he didn't want to do it. That doesn't change the fact that Mr. Umling could do it as an operating engineer as the parties agreed to in accordance with the Collective Bargaining Agreement.
Q. Okay. Would it be a fair statement that you've been in the construction business for a reasonable period of time?
A. Well, except for three years serving my country, I've been in the construction business for more than forty years.
Q. And has it been your experience during that time that individuals who would be characterized as supervisors under the National Labor Relations Act are also members of a labor organization?
A. Yes, as they are permitted to be.
Q. Right?
A. And in this case as the parties agreed to do.

The electrical foremen on the job are members of IBEW 99 as are the mechanic foremen of Engineers 57.

Q. We can say then that the fact that someone is a supervisor -- strike that, if you would. We can say that the fact that someone is a member of a labor organization does not preclude them from being considered a supervisor within the meaning of the Act?

A. That's true.

MR. COBLEIGH: If we may have a moment?

MR. MURPHY: Short recess.

(A short recess was taken.)

MR. COBLEIGH: No other questions.

MR. MURPHY: Okay. Mr. Shank, any redirect?

MR. SHANK: No.

MR. MURPHY: Rebuttal?

MR. COBLEIGH: No, I don't believe so.

MR. MURPHY: Anything further, Mr. Shank?

MR. SHANK: Closing argument.

MR. MURPHY: Orally or by brief?

MR. COBLEIGH: I'd just as soon argue it. I don't think it's a --

MR. MURPHY: A briefable matter.

MR. COBLEIGH: Yes.

MR. SHANK: I think that everything that is needed is in the record unless the arbitrator would care for one. If you do, we certainly would provide one.

MR. MURPHY: It's, you know, don't give me the option because it is much easier for me to have written statements that are positioned in front of me so that I can go back and forth if need be. But, if you don't want to do it, then I'm not going to --

MR. COBLEIGH: Well, we can do something in a couple of pages that outlines the position without beating the thing to death, I would assume.

MR. SHANK: That's certainly up to you. If you want to do it, that's fine. I'll be glad to do it but you should really give us thirty days, forty-five days.

MR. MURPHY: We've got to get the transcript.

MR. SHANK: Forty-five days after receipt of transcript, how's that?

MR. COBLEIGH: I can do it in less than that but if you would like forty-five, that's what

we'll do.

MR. SHANK: I would prefer that because I don't usually do this. Yes, I'd appreciate that amount of time.

MR. COBLEIGH: Fine.

MR. MURPHY: Okay, well, two weeks for the transcript and forty-five days after that. All right. Forty-five days is enough time so if the transcript is late by two or three days, it's not going to much matter, I don't think.

MR. SHANK: No.

MR. MURPHY: All right. Okay. I think that concludes the proceedings at this juncture. Gentlemen, thank you very much.

MR. COBLEIGH: I'm going to take the pictures and make copies for Mr. Murphy.

MR. MURPHY: I normally keep my own set of exhibits, which would be the record copy, I guess.

(Hearing concluded at 12:24 p.m.)

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, SC.

I do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of this Court, especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

I further certify that neither the deponent nor any party requested a review of the transcript.

IN WITNESS WHEREOF I have hereunto set my hand this 10th day of June, 2005.

Sally Brassard RPR/CSR - Notary Public

SALLY BRASSARD, CSR/RPR
NOTARY PUBLIC
MY COMMISSION EXPIRES: 1/16/09

7

U-2

COMBINED UNION EXHIBIT

















8



ux3




ux4




ux5



-UX6



UX7



UX8



ux9

ux10

9

cx1
p1

**Shank/Balfour Beatty**
Providence CSO Tunnel
220 Terminal Road, Providence, RI 02905
Tel. (401) 941-1495, Fax. (401) 941-1498

May 25, 2005

LIUNA Local 271
410 South Main Street
Providence, RI 02903

Attention: Mr. Michael Sabatoni
Business Manager of
Local Union 271

IUOE Local 57
141 Gano Street
Providence, RI 02906

Attention: Mr. Richard Houlihan
Business Manager/
President

Gentlemen:

Please recall the meeting that we held on March 17, 2004, in the LIUNA Local 271 conference room at 410 South Main Street, chaired by Mr. Ronald M. Coia, requested by Mr. Durand of IBEW Local 99, to discuss electrical safety on S/BB's Providence tunnel project, and whether other crafts or S/BB's Electrical Superintendent, Mr. Parada, were doing what Mr. Durand called "*electrical work*" assigned to the Electricians under Section 7, Jurisdiction, of the Special Tunnel Agreement.

With respect to the latter issue, I stated that what Mr. Durand was calling "*electrical work*" was not electrical work at all, but work not requiring the skill of the electrician, which historically had been performed in tunnels by the Laborers and Operating Engineers as incidental to performing their work. As examples of this kind of work, I listed plugging and unplugging of electrical cords for pumps, lights, hand-held tools, and the like; pushing start-stop and breaker reset buttons for pumps, fans, hand-held tools, TBM operating functions, and the like; and on the TBM, removing and reinstalling heavy electrical motors, transformers, and cabinets (with the electricians disconnecting and reconnecting the related electrical wiring), work requiring the rigging skill of the Laborer and Operating Engineer. Although Mr. Durand disagreed with my work assignment, both Mr. DiRissio for LIUNA Local 271, and Mr. Sullivan for IUOE Local 57, agreed with S/BB that work of the kind listed was not electrical work in connection with the Special Tunnel Agreement, and fell within the jurisdiction of the other crafts.

ex 1
p 7



This work assignment issue was settled on March 17, 2004 in accordance with Section 7, Jurisdiction, of the Special Tunnel Agreement, and we heard nothing about it for several months; now Mr. Durand has reopened the same issue, this time under Section 11, Grievance Procedure. We do not think that Mr. Durand will succeed in overturning our work assignment in this way, but we will keep you advised.

Very truly yours,

M.L. Shank/Balfour Beatty
Managing Partner

MLS/cp
c.c. Mr. Ronald M. Coia

C ¥ 1
p 3

**INTERNATIONAL UNION OF OPERATING ENGINEERS**

**LOCAL 57 AND ITS BRANCHES**

141 Gano Street
Providence, Rhode Island 02906
Tel. (401) 421-6678
Fax. (401) 421-9756

RECEIVED
JUN 0 2 2005
By

Richard Houlihan
*Business Manager/President*

May 31, 2005

Mr. Mike Shank
Shank/Balfour Beatty
Providence CSO Tunnel
220 Terminal Road
Providence RI 02905

Dear Mr. Shank,

In response to your letter dated May 25, 2005 regarding a meeting that took place on March 17, 2004 at the Laborers Local 271's Union Hall, I was in attendance at that meeting and vividly recall the subject and content of said meeting.

The position of the Operating Engineers, Local 57, in this matter, has not changed since that time. We agree with Shank/Balfour Beatty's assignment of the work and jurisdiction.

Please feel free to contact my office with any questions or concerns with this or any other matters.

Thank you,

Richard Houlihan

Richard Houlihan
Business Manger/President

cx 1
p 4

# Construction and General Laborers' Local Union 271

RECEIVED
JUN 03 2005
By________

June 2, 2005

Mr. Mike Shank
Shank/Balfour Beatty
Providence CSO Tunnel
220 Terminal Road
Providence, RI 02905

Dear Mike:

With regard to your letter dated May 25, 2005 referencing a meeting held on March 17, 2004, chaired by Ronald M. Coia and attended by Mr. Durand for Local Union 99, Mr. Sullivan for Local Union 57 and Mr. DiRissio and myself for Local Union 271, I am in agreement with your jurisdictional assignments as stated and recollection of said meeting.

If I can be of further assistance, please contact me at your convenience.

Very truly yours,

Michael F. Sabitoni
Business Manager

MFS/gb

410 South Main Street, Providence, Rhode Island 02903 • Telephone (401) 331-9682 • Fax (401) 861-1480

10

A.G.C.

# EMPLOYERS MONTHLY CONTRIBUTION REPORT

INTERNATIONAL UNION OF OPERATING ENGINEERS - LOCAL 57
141 GANO STREET - PROVIDENCE, RI 02906

cx 7

Tel. (401) 331-9191
Fax (401) 421-9756

Month Covered: JAN. 20 05
If more forms are needed check here ☐

Contractor's Name: SHANK/BALFOUR BEATTY
Address: 220 TERMINAL RD
City, State, Zip: PROVIDENCE, RI 02905
Telephone: 941-1495 Fax: 941-1498

Project: PROVIDENCE CSO TUNNEL
Location: PROVIDENCE
Pay Date Starting: 1/02
Pay Date Ending: 1/23
Job Completed: YES (NO)

| S.S.NUMBER | EMPLOYEE'S NAME | HOURS WORKED | TERMINATION |
|---|---|---|---|
| | SEE ATTACHED | 10,085.5 | |
| | ☆ DUES/PEAF ONLY | | |
| | R. COOK (SS# 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) | 266.0 | |
| | | 266.0 ☆ | |
| | TOTAL HOURS | 10,085.5 | |

**EMPLOYERS CONTRIBUTIONS**

| | | |
|---|---|---|
| Health & Welfare Fund @ | 5.93 | 59,807.02 |
| Pension Fund@ | 4.17 | 42,056.54 |
| Apprenticeship / Training Fund@ | 0.40 | 4,034.20 |
| Administrative Dues@ | 0.40 | 4,140.60 |
| PEA Fund @ | 0.03 | 310.55 |
| Industry Advancement Fund@ | 0.15 | 1,512.83 |
| Legal Service Fund@ | 0.10 | 1,008.55 |
| Annuity Fund @ | 3.25 | 32,777.88 |
| Unified Trust@ | 0.50 | 5,042.75 |
| Total Amount Due: | $14.93 | 150,690.92 |

**MAKE ONE CHECK PAYABLE TO:**
**LOCAL 57 FUNDS**

Payment is due by the 20th day of each month covering payroll periods ending in the previous month.

Contributions are due for all payroll hours including paid holidays.

Signature: M. Filipowski Title: BUSINESS MGR. Date: 2/3/05

PR1UNIRPT PROVIDENCE CSO PAGE 5
OPERATING ENGINEERS JAN 26, 2005 13:24:27
STARTING PERIOD ENDING DATE : 010205 ENDING PERIOD ENDING DATE : 012305

| EMPLOYEE NAME | SOC SEC NUM | TOTAL HOURS |
|---|---|---|
| CRAFT : MECHANIC FOREMAN | | |
| JACKSON, MARTIN J | 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 | 254.50 |
| QUILLEN, TIMOTHY E | 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 | 250.00 |
| CRAFT : MECHANIC FOREMAN | | |
| UHLING, DONALD J | 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 | 180.00 |
| CRAFT : TUNNEL OPERATORS, MECH WELDERS | | |
| ALLEN, ROBERT F | 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 | 220.50 |
| BAILEY, TIMOTHY F | 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 | 218.50 |
| BARBER, JOHN F | 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 | 195.00 |
| BERUBE, STEPHEN J | 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 | 249.50 |
| CANDELMO, GERALD A | 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 | 198.50 |
| CAPRIO, DAVID G | 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 | 238.50 |
| CHISHOLM, STEPHEN D | 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 | 189.50 |
| COIA, KENNETH A | 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 | 30.00 |
| CORREIA, WILLIAM M | 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 | 189.50 |
| DENEAULT, DAVID S | 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 | 236.50 |
| DE OLIVEIRA, SEVERINO M | 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 | 218.00 |
| DESCHANE, PAUL G | 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 | 196.00 |
| DESANTIS, JR, ANTHONY D | 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 | 265.50 |
| DUCHARME, MICHAEL J | 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 | 248.50 |
| DUMONT, ERNEST | 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 | 210.00 |
| FELDHAUS, ZACHARY Q | 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 | 187.00 |
| FERSCHKE, JASON R | 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 | 179.00 |
| FRANZBLAU, WOLFGANG | 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 | 245.00 |
| GLIOTTONE, DONALD C | 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 | 239.50 |
| HAMILTON, DAMON D | 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 | 266.50 |
| HORTA, RONALD S | 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 | 192.50 |
| JENKINS, DENNIS W | 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 | 72.00 |
| KELLS, RICHARD J | 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 | 230.00 |
| KNIGHT, LLOYD G. | 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 | 169.00 |
| MARRA, DONALD A | 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 | 191.00 |
| MCBRIDE, MICHAEL D. | 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 | 238.50 |
| MCFADDEN, JAMES D | 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 | 263.50 |
| MONIZ, DANA W | 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 | 213.00 |
| NICKERSON, RICHARD E | 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 | 181.00 |
| PATERSON, SCOTT W | 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 | 135.00 |
| PROULX, STEVEN R | 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 | 212.50 |
| ROMANO, BENNIE J | 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 | 221.00 |
| SILVEIRA, ROBERT W | 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 | 236.00 |
| SOUSA, JR., JOHN | 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 | 41.50 |
| TABIS, JOHN C | 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 | 230.50 |
| TACELLI, CHRISTOPHER W | 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 | 193.50 |
| TEFFT, RUSSELL W | 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 | 225.50 |
| TIROCCHI, JOSEPH P | 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 | 223.50 |
| TITUS, SR, JAMES L | 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 | 206.50 |
| TORKOMIAN, GARY V | 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 | 218.50 |
| VENDITTELLI, BRIAN P | 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 | 223.50 |
| VIERA, BENJAMIN M | 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 | 181.00 |
| WELCH, SR, JOHN J | 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 | 91.50 |
| CRAFT : TUNNEL OILERS | | |
| COIA, KENNETH A | 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 | 121.00 |
| LEMA, GEORGE | 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 | 177.50 |
| CRAFT : TBM OPERATOR | | |
| TATUM, JEFFREY J | 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 | 242.50 |
| PAGE TOTAL : | | 9838.00 |

PR1UNIRPT PROVIDENCE CSO PAGE 6

OPERATING ENGINEERS JAN 26, 2005 13:24:27

STARTING PERIOD ENDING DATE : 010205 ENDING PERIOD ENDING DATE : 012305

| EMPLOYEE NAME | SOC SEC NUM | TOTAL HOURS |
|---|---|---|
| CRAFT : TBM OPERATOR | | |
| BOTH, KENT R | 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 | 247.50 |
| PAGE TOTAL : | | 247.50 |
| TOTAL, ALL EMPLOYEES : | | 10086.50 |

| DESCRIPTION | RATE | METHOD | AMOUNT DUE |
|---|---|---|---|
| HEALTH | 5.93 | $/HOUR | 59807.02 |
| PENSION | 4.17 | $/HOUR | 42056.54 |
| LEGAL | .10 | $/HOUR | 1008.55 |
| ANNUITY | 3.25 | $/HOUR | 32777.88 |
| UNIFIED | .50 | $/HOUR | 5042.75 |
| APPRENTICE | .40 | $/HOUR | 4034.20 |
| IAF | .15 | $/HOUR | 1512.83 |
| DUES | .43 | $/HOUR | 4336.77 |
| | | | ---------- |
| | | | 150576.54 |

PR1UNIRPT PROVIDENCE CSO PAGE 7
NO CAL OPER ENGINEERS JAN 26, 2005 13:24:27

STARTING PERIOD ENDING DATE : 010205 ENDING PERIOD ENDING DATE : 012305

| EMPLOYEE NAME | SOC SEC NUM | TOTAL HOURS |
|---|---|---|
| CRAFT : MASTER MECHANIC | | |
| COOK, RICKIE F | 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 | 266.00 |
| PAGE TOTAL : | | 266.00 |
| TOTAL, ALL EMPLOYEES : | | 266.00 |

| DESCRIPTION | RATE | METHOD | AMOUNT DUE |
|---|---|---|---|
| HEALTH | 5.65 | $/HOUR | 1502.90 |
| PENSION | 4.00 | $/HOUR | 1064.00 |
| ANNUITY | .40 | $/HOUR | 106.40 |
| IAF | 2.31 | $/HOUR | 614.46 |
| DUES | .43 | $/HOUR | 114.38 |
| VAC | 3.45 | $/HOUR | 917.70 |
| | | | ----------- |
| | | | 4319.84 |

11

# American Arbitration Association

LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

IBEW, LOCAL 99

&

SHANK/BALFOUR BEATTY

CASE NUMBER: 11 30 00458 05

## AWARD OF ARBITRATOR(S)

I (WE), THE UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

The grievance is sustained.

The Company shall forthwith assign a licensed electrician to the third shift.

The Company shall provide a sum of money sufficient to pay back pay and benefits for one third shift electrician commencing on August 21, 2005, to be divided equally among such employees as contemplated in the Union's "Remedy Sought" portion of the grievance.

At the request of either party I will retain jurisdiction for a reasonable period of time to address any problems arising in the implementation of this award.

October 10, 2005
(Date)

(Signature of Arbitrator)
Albert G. Murphy

STATE OF

} SS:

COUNTY OF

On this day of , 19 , before me personally came and appeared , to me known and known to me to be the individual(s) described in and who executed the foregoing instrument, and he acknowledged to me that he executed the same.

AMERICAN ARBITRATION ASSOCIATION
LABOR TRIBUNAL

ARBITRATION AWARD

| | |
|---|---|
| In the matter of: | AAA # 11 300 00458 05 |
| IBEW LOCAL 99 | Dates of Hearings: May 6, 2005<br>June 6, 2005 |
| And | |
| SHANK/BALFOUR BEATTY | Date of award: October 10, 2005 |
| ARBITRATOR: | Albert G. Murphy, Esq. |
| APPEARANCES: | |
| For the Union: | Gerard P. Cobleigh, Esq. |
| For the Company: | Michael L. Shank, Managing Partner |

ISSUE:

The parties were unable to agree on a statement of the issue..

The Union suggested: What shall be the disposition of the grievance?

The grievance stated:

> "Electrical work on the Combine Sewer Overflow Abatement Project has been done, and is continuing to be done by unlicensed 3rd shift personnel other than members of IBEW Local Union 99 in violation of the Special Tunnel Agreement and the State of Rhode Island licensing laws, with the knowledge and apparent approval of Michael Shank, Managing Partner, S/BB."

The Company put forth two statements of issues:

> Whether the matter is arbitrable as being a jurisdictional dispute, exempted under Section 7 of the Agreement.

> Whether the arbitrator has been afforded the authority under the agreement to adjudicate substantive arbitrability

The Union's suggested issue will be adopted on the merits; the Company's as it relates to the arbitrability questions raised.

) )

APPLICABLE CONTRACTUAL PROVISIONS:

**SPECIAL TUNNEL AGREEMENT**

1. This is a pre-hire Special Tunnel Agreement (STA) between Shank/Balfour Beatty (S/BB) and Laborers' International Union of North America, Rhode Island Laborers District Council, on behalf of Local Union 271 (Laborers); International Union of Operating Engineers, Local Union 57 (Operating Engineers); and the International Brotherhood of Electrical Workers, Local Union 99 (Electricians). The term "Union" or "Unions" shall refer to the Laborers, Operating Engineers, or Electricians, individually or collectively. The term "Parties" shall refer to S/BB and the Unions.

....

7. JURISDICTION: S/BB shall assign jurisdiction for the work as follows:

   A. In general, the Operating Engineers shall have jurisdiction for operating the TBM, tunnel locomotives, concrete pumps, all cranes, excavators, backhoes, front end loaders, skid steer loaders (Bobcats) forklifts, dozers, graders, compressors, engine driven pumps, mine utility trucks, and raise boring machines. The Operating Engineers shall have jurisdiction for maintaining equipment; and for performing layout, fitting, burning and welding in connection with manufacturing plant and equipment; and for surveying (except surveying requiring the use of a Rhode Island Registered Professional Land Surveyor)

   B. In general, the Electricians shall have jurisdiction for performing electrical work required for manufacturing equipment and for construction of the work.

   C. In general, the Laborers will have jurisdiction for performing laborer/miners work required for manufacturing equipment and for construction of the work. Should a jurisdictional dispute arise, the dispute will be settled by the Unions themselves, and S/BB shall be bound by that settlement. No settlement, however, shall result in S/BB having to employ a double crew or use more employees than the minimum required to perform the work, nor shall it result in S/BB having to use employees who are not qualified to perform the work. If the Unions cannot reach any settlement, S/BB's original assignment shall remain in effect.

11. GRIEVANCE PROCEDURE: Any dispute arising from performance of this STA except for a jurisdictional dispute…shall be settled by the following three step procedure…Step 3. Should the best efforts of the parties fail to achieve resolution within ten (10) working days after the grievance has been filed in writing, the grieving party may elect to have the grievance decided by arbitration. Should the grieving party so decide, it shall notify the other Party in writing within seven (7) working days after reaching Step 2 impasse. Unless the

foregoing written deadlines have been extended by mutual agreement, in writing, failure to meet a deadline shall render the grievance null and void. After a Party has issued its letter of intent to seek arbitration, the Parties shall jointly and promptly request that the American Arbitration Association furnish a panel of seven (7) prospective arbitrators, experienced in construction, from which the Parties shall select one arbitrator by a process of striking off names. The selected arbitrator shall hear and decide the grievance. The Parties agree that, in deciding the grievance, the arbitrator shall not have the authority to change, add to, or delete from the STA. Each party shall bear all costs of presenting its own case, and the arbitrator's invoiced cost shall be divided equally between the Parties. Any dispute not called to the attention of the non-grieving Party within ten (10) days of its firs occurrence shall be deemed to have been waived. No decision by the arbitrator may provide retroactivity beyond sixty (60) days. The arbitrator's decision shall be final and binding.

INTRODUCTION:

This case arises from a grievance brought to protest the alleged performance of electrical work by an Operating Engineers foreman. Not having been resolved through the contractual grievance procedure, the matter was claimed for arbitration under the rules of the American Arbitration Association.

Hearings were held on the dates indicated. Both parties appeared and were heard and have filed briefs upon receipt of which the hearings were declared closed by Case Manager Molly A. Brown.

The Employer has interposed reservations of rights to claim both substantive and procedural non-arbitrability.

BACKGROUND OF THE CASE:

The Parties, Local 99 of the International Brotherhood of Electrical Workers, ("The Union") and Shank/Balfour Beatty ("S/BB" or "The Company") are parties to a collective bargaining agreement applicable to a project known as the "Providence Combined Sewer Overflow Tunnel".

This is a huge tunnel, eventually to stretch 16,000 feet under the City of Providence, having the capacity to retain 60 million gallons of waste water. The digging is done by a tunnel boring machine (TBM) which is 225 feet long, 30 feet in diameter, and weighs 690 tons. It is capable of drilling through solid rock at the rate of 19 feet per hour.

The collective bargaining agreement, referred to as the "Special Tunnel Agreement", includes, besides Local 99, the Operating Engineers and LIUNA.

As the Union's version of the issue indicates, much if not all of the dispute from a factual basis revolves around the electrical equipment and other components connected with the project.

Credible testimony and photographs showed a total of twelve electrical panels, eight on the upper level and four on the lower. Each panel contains terminal blocks, contactors, motor starters and control circuits with voltage up to 480.

There are prominently displayed required OSHA warnings: "480 VOLTS-WARNING, PANEL HAS MUTIPLE VOLTAGE SUPPLY SOURCES. DANGER, ELECTRICAL EQUIPMENT, AUTHORIZED PERSONNEL ONLY."

On August 24, 2004, Patrick Brady, second shift steward, having received complaints from workers, and having himself observed indications that non-electricians were getting involved with what he described as "high voltage equipment, doing work." (T2-26), addressed a group of third shift workers who he believed were doing such work. He told them that what they were doing was, among other things, dangerous.

He was then confronted by Donald Umling who told him, in a fairly hostile manner, that he, Umling, would pretty much do what he pleased, that he knew more about electricity than Brady and that he didn't care if what he said "pissed off" Brady.

The following February, Brady had another confrontation with Umling when he, Brady, was trouble shooting a line leading to a gas detection breaker. While Brady and a partner were in one part of the machinery trying to find out the problem, Umling was in another, indiscriminately switching breakers on and off. According to Brady, "If one of us had been in that panel, he would have been electrocuted." T2-32)

When he again confronted Umling, he said, "Don't bother me". Brady then complained to his business agent, which, in his words, "led to a letter coming back from Mr. Shank saying that it was basically no big deal. But he also in that letter labeled Donald Umling as his supervisor." (T2-32)

At the hearing of June 6, 2005, Mr. Brady was asked, by Mr. Shank,

> "And if electrical work needs to be done on graveyard shift or at some time perhaps after you've gone home, isn't it true that electricians are called out to do that kind of work?"

He responded:

> "Well, one time they called them out was very recently. Last Thursday our shift ended at 2:00 that day and I think at 4:00, somebody other than an electrician was up rearranging one of the 480 volt lights in the shaft and it filled up with water and it shut down the entire—it shorted-out two of the 480 phases and shut down the

electrical power right out of the street and shut the job down. That's when they called in the electrician to straighten it out..." (T2-p36, 37)

Mr. Shank later inquired:

Q."...The other workers on the job, if they want to start an electrical motor, they don' have to know what's inside the panel, do they?

A. They should.

Q. Why should they?

A. If they're going in there they should know what the hazards are.

Q. That's not the question. My question is, to start a motor, any craft can push a button and the motor will start, isn't that true?

A. Sure.

Q. And they don't have to know what's inside that panel?

A. I disagree. Because you've got to know what not to hit. I mean, if you look at the array of electrical equipment in there, there's a lot of exposed parts in there. If you don't know electricity, you're at risk. That's my issue." (T2, p38, 39)

Another Union witness, Wolfgang Franzblau, described an incident in December, 2004, wherein Mr.Umling attempted to extinguish an electrical fire by pouring water on it. (T2-p51)

The matter came to a head in March, 2004, when, after a complaint by Local 99, a meeting was held, attended by the three Unions and Mr. Shank. At the meeting, Mr. Shank set forth the Company's position as to what was electrical work; "Pushing buttons to start motors, resetting breakers, plugging in electrical cords, dismounting electrical motors from the equipment once the electricians had turned the power on and off..." (T2p59)

The Company introduced copies of letters sent by Mr.Shank to representatives of he Operating Engineers and Laborers in which he solicited, and got, endorsements of the Company's positions on what constituted "electrical work." However, neither Union appeared at nor otherwise participated at the hearings in this matter.

COMPANY POSITION:

As indicated by its proffered statement of the issues, the Company claims that the case is not arbitrable on two counts.

First, the matter raised by the grievance, the allocation of electrical work, is specifically exempted by Section 7 of the Agreement, as being a jurisdictional dispute.

Second, the question of arbitrability is not properly determined by the arbitrator but is more appropriately a question for a court, citing Steelworkers vs. *Warrior and Gulf Navigation Company,* 363 U.S.574, 582 (1960) "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agree to arbitrate is to be determined by the court, not the arbitrator..."

UNION POSITION:

The Union's case is, as indicated in the original grievance, consists in the claim that electrical work, "has been done and is continuing to be done by unlicensed third shift personnel....

In support of this position, it presents testimony of second shift steward Patrick Brady, an electrician, backed up by Wolfgang Franzblau, an operating engineer, to the effect that, on several occasions, Donald Umling, a foreman and a member of the Operating Engineers, had performed work on or involving high voltage electrical equipment clearly marked as such by OSHA required signs.

Brady expressed the opinion that on at least one and possibly two of these occasions, considerable harm, including electrocution, might have resulted.

Franzblau further described an incident in which Mr. Umling attempted to extinguish an electrical fire by pouring water on it.

DISCUSSION:

Necessarily, because they affect my jurisdiction, i.e. power to act, the Company's claims of non-arbitrability must first be determined.

Taking these matters in proper sequence, the first such claim to be addressed would be the breadth of my authority under the agreement, i.e. whether it carries with it the ability to adjudicate the core question of whether the issue as stated between the parties is arbitrable under the Agreement.

Such a determination would depend on two factors. first, the wording of the grant of authority in the Agreement and second, the context in which it is to be evaluated. Here, the grievance procedure is applicable to "any dispute arising from the performance of the STA, except for a jurisdictional dispute...[which dispute] shall be settled by the following three step procedure. The third step permits the grieving party "to elect to have the grievance decided by arbitration."

The agreement then goes on to provide, "The selected arbitrator shall hear and decide the grievance. The parties agree that, in deciding the grievance, the arbitrator shall not have the

authority to change, add to, or delete from the STA...No decision by the arbitrator may provide retroactivity beyond sixty days. The arbitrator's decision shall be final and binding."

It requires no monumental intellectual effort to infer from such broad language an implied authority to determine whether or not some particular matter was intended by the parties to be subject under the contract to arbitration.

But, even if it did, there is a far more practical question remaining implicit in the Company's position. If arbitrability of a particular issue is to be subject to determination by a court, which court is that and how does the question get before that court?

The obvious course suggested by the Company's approach is to permit the matter to be arbitrated, at the termination of which the unsuccessful party would then go to court and pursue the claim that the matter was not subject to arbitration in the first place. Then, if successful, that party could proceed to litigate the matter from scratch.

This phenomenon was visited (albeit in reverse) in Franceschi vs Hospital San Carlos, Inc. et al, USCA1 Opinion 04-2104, August 24, 2005. Here, the defendant hospital went the entire litigation route and, at the unsuccessful end thereof, cited an arbitration clause in the agreement subject of the suit.

The precise question was whether the defendant, having raised the question of an arbitration clause, and having been ruled against by the trial court, had an obligation to pursue an interlocutory appeal of the denial. The Court, citing Colon v. R.K. Grace & Co. 358 Fed.3rd 1, 4 (1st Cir.2003) ruled that failure to take such an appeal could forfeit the right to arbitration;

> "...the reason is that it is wasteful to have a full trial and then determine by a post-trial appeal that the whole matter should have been arbitrated and so start again..."

The same rationale, although, as suggested, in reverse, would appear to apply here. If the Company wanted to seek judicial interpretation of the arbitration clause, it should have done so in the first instance. It did not.

Accordingly, the Company's claim of non-arbitrability on the grounds of lack of authority is denied.

The Company's other claim of non-arbitrability is founded on the proposition that jurisdictional disputes are exempted from the grievance process under section 11. Grievance Procedure.

Its conclusion that the electrical work involved here was not appropriately assigned to Local 99 rests on the fact that, at a meeting requested by Local 99 to protest what it considered unsafe practices involving electrical equipment, both the Operating Engineers

and the Laborers agreed with management that the work in question was not exclusively Local 99's.

Thereafter, quite possibly in preparation for this case, Mr. Shank wrote letters to the Operating Engineers and the Laborers, asking for their recollections of the meeting. Both concurred with Mr. Shank's version of events.

Neither Union participated in this grievance, appeared at the hearing or otherwise was involved, except that copies of their responses to Mr. Shank's letter were offered in evidence.

At the core of the dispute at this point is the nature of what constitutes a jurisdictional dispute.

At the first hearing, after a lengthy colloquy with the advocates, I stated my understanding of the definition of the term "jurisdictional dispute", saying,

> "...if a jurisdictional dispute is one between two unions over a proper allocation of work, this is not it. This is a question of management, a foreman, doing electrical workers' work and an objection to that by the electricians..." (T1,p 21,22)

In a case before the National Labor Relations Board, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT 190, LOCAL LODGE 1414 and INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 10 AND INTERNATIONAL LONGSHORE AND WAREOUSE UNION, LOCAL 75, Case No. 32-CD-163-1, June 30, 2005, the Board observed,

> "...therefore,, we conclude that the evidence fails to establish a *traditional jurisdictional dispute between two rival groups of employees claiming the same work, with an innocent employer caught in the middle...*" (Italics added)

The situation here, as I observed at the first hearing, is not what the Board calls a "traditional jurisdictional dispute."

The complaining party, Local 99, is not complaining that either of the other two unions is getting work that 99 should have. Rather, the complaint is that Mr. Umling, alone, is performing electrical work which he is not capable of performing safely. Local 99 is not grieving the pulling of plugs, operation of starter motors, etc., by other members of the Operating Engineers or Laborers. It is grieving the actions of Mr. Umling who, *as a member of management,* has performed work on electrical equipment in violation of clearly marked OSHA prohibitions. That he was and is a member of management is obvious by virtue of his designation as a foreman and his functioning as a supervisor. His membership in the Operating Engineers is inconsequential.

The OSHA warnings in question, that the equipment is to be operated by "authorized" persons only, clearly require operation by licensed electricians, which Mr.Umling is not.

The letters from Mssrs Houlihan of the Operating Engineers and Sabatoni of the Laborers, as hearsay are entitled to markedly reduced weight and in fact have minimal impact.

In summary, the dispute in this case has nothing to do with jurisdictional matters; it is purely and simply a complaint by Local 99 of unsafe job conditions brought about by the actions of one of its foremen.

Turning to the merits of the case, it is apparent that the same facts which compel a finding of arbitrability are equally persuasive on the question raised by the grievance. As indicated immediately above, the grievance claimed unsafe work conditions, which claim is well supported by the evidence. Rather than address the problem at its root, i.e. Mr. Umling, the Company took a rather dismissive attitude towards the Union's complaint. Hence this grievance.

On the question of a remedy, the Union has requested back pay and benefits to be divided amongst electricians employed between June 9, 2004 and such time as an electrician shall be placed on the third shift. The Agreement, however, restricts the authority of the arbitrator to award more than sixty days in arrears, which I would calculate as August 21, 2005.

AWARD

The grievance is sustained.

The Company shall forthwith assign a licensed electrician to the third shift.

The Company shall provide a sum of money sufficient to pay back pay and benefits for one third shift electrician commencing on August 21, 2005, to be divided equally among such employees as contemplated in the Union's "Remedy Sought" portion of the grievance.

At the request of either party I will retain jurisdiction for a reasonable period of time to address any problems arising in the implementation of this award.

Albert G. Murphy, arbitrator